Berry *vs.* The State of Georgia.

No. 75.—JAMES BERRY, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant.

[1.] In an indictment for larceny from the house, it is not necessary to allege that the accused entered *with an intent* to steal; the crime may be consummated where the original entry was not felonious.

[2.] If larceny from the house or any other offence not capital, committed by a slave, has been done by the procurement of a free white person, the law substitutes him or her in the place of the slave and treats them as principal in the crime.

[3.] In an indictment for larceny from the house, the accusation was in those words: "the said J. B. feloniously entered the dwelling house of the said W. M. in the night time, and having so entered, seven thousand dollars, to wit, two thousand dollars in gold and silver coin of the value of two thousand dollars, and five thousand dollars in bank bills of the value of five thousand dollars, the property of the said W. M. in the said dwelling

house, being then and there found, did privately and feloniously take and carry away with intent to steal the same." *Held*, that the description of the money was sufficiently particular; and that it was not necessary to allege or prove what portion of the coin were Washingtons or Eagles, or Spanish milled dollars: or that the bank bills were each of such a date, issued by a particular bank and payable to some certain person.

[4.] On the trial of an indictment against a free white citizen, the State may give in evidence the confessions of a negro, even when extorted by the pain of punishment, provided they are proven by a white person, not as independent testimony, but as an inducement and in illustration of what was said and done by the accused, he being present, consenting that the negro should tell all he knows.

[5.] Confessions extorted by hope or fear cannot be given in evidence against the prisoner or any body else.

[6.] For counsel to attempt surreptitiously to get before the Jury, facts by *way of supposition,* which have not been proven, is highly reprehensible; and the practice should be instantly repressed by the Court, without waiting to be called upon by the opposite party.

[7.] In what sense are the *Jury* in a criminal case, *judges* of the *law?* Quere.

[8.] It is not the province of the Court to express an opinion as to the sufficiency of the evidence in a criminal case. The Jury alone have the right to determine upon the force and effect of the facts and circumstances proved, and whether or not they are satisfactory in warranting them in finding the defendant guilty.

[9.] It is the duty of the Court to keep the Jury together, in a criminal case, from the time it is *submitted* to them, until they are finally discharged from its consideration. No application should be addressed by the Court to counsel to allow the Jury to disperse.

[10.] Should the counsel on both sides unite in petitioning the Court to permit the Jury to disperse, there would perhaps be no impropriety in granting the application, at any rate in the trial of petty offences. Still it is a discretion which should be very cautiously exercised under any circumstances.

[11.] The administration of justice should not only be pure, but above suspicion.

[12.] Proof that a trunk was taken and carried away from the house, in which there was money, is sufficient to sustain a charge of taking and carrying away money, especially when all the facts show the *quo animo* with which the trunk was taken.

[13.] Applications for new trials are not favored by the Courts.

[14.] It is pretty generally agreed, that it is incumbent on a party who asks for a new trial, on the ground of newly discovered evidence, to satisfy the Court, 1st. That the evidence has come to his knowledge since the trial. 2d. That it was not owing to the want of due diligence that he did

Berry *vs.* The State of Georgia.

not acquire it sooner.   3d. That it is so material, that it would probably produce a different verdict.   4th. That it is not cumulative only, viz speaking to facts in relation to which there was evidence on the trial. 5th. The affidavit of the witness himself should be procured or its absence accounted for; and 6th. The new trial will not be granted if the only effect of the evidence will be to impeach the credit of a witness.

[15.] It is an elementary principle of the law of evidence that the understanding and opinion of witnesses are not to be received. except in matters of science and a few special cases, resting upon peculiar circumstances.

[16.] It is the business of the witnesses to state facts, and it is the province of the Jury, under the direction of the Court, to draw such inferences and conclusions from these facts as in their judgment they will warrant.

[17.] In a variety of cases, witnesses are permitted to give their opinion in evidence in connection with the facts upon which it is formed.

[18.] In cases of insanity, the rule of allowing a witness to express his belief, when coupled with the facts upon which it is founded, is now generally if not universally admitted.

[19.] Is it possible to draw a line of demarcation and to state definitely in what class or classes of cases the opinion of the witness may be expressed, and when it must be excluded ?   *Quere.*

[20.] Where the question at issue is one of *opinion merely,* as that of sanity or insanity, solvency or insolvency, personal identity, hand-writing, age, &c.—in all such cases, it should be allowable for the witness to give his opinion, coupled with the facts from which it is formed.

[21.] Where *matters of fact* are to be tried—as contracts, crimes, trespasses on the case, torts and such like—the testimony should be restricted to words and facts only.

[22.] Looking to the *nature of the investigation,* is not this rule founded in good sense and the nature of things ?   *Quere.*

Indictment, in Floyd Superior Court.   Tried before Judge John H. Lumpkin, July Term, 1851.

This was an indictment for larceny from the house, which was charged in the bill of indictment, as follows: "For that the said James Berry on the tenth day of April, eighteen hundred and fifty, in the County aforesaid, with force and arms, the dwelling house of one William Montgomery, there situate, unlawfully, wilfully, feloniously and maliciously did enter in the night-time and having so entered, seven thousand dollars, to wit, two thousand dollars in gold and silver coin of the value of two thousand dollars, and five thousand dollars in bank bills of the

value of five thousand dollars, and three thousand dollars in promissory notes of the value of three thousand dollars, of the property, goods and chattels of the said William Montgomery, in the said dwelling house, did then and there, being found then and there, feloniously, unlawfully, wilfully, maliciously, and privately did take and carry away, with intent to steal the same, contrary to the laws of the said State, the good order, peace and dignity thereof."

On the trial of this indictment, the proof went to show that the felony had been committed by two negroes named Phil and Tom, and the State sought to convict the defendant, by showing that he procured the negroes to commit it, and got the money, or part of it.

The following is such of the testimony as was admitted by the Court, after objection by the defendant.

It was proved that the negro Phil was whipped for the purpose of forcing him to disclose who were concerned with him in the larceny; that defendant and several others were present and all agreed that the negro should tell all he knew; that the negro then accused defendant of being concerned in it, upon which defendant appeared enraged and approached the negro with a knife in his hand, threatening to kill him, but was prevented from getting to him; that afterwards defendant said to one of the witnesses, that he knew from the negro's countenance, that he was going to accuse him.

John Tate testified that he had several conversations with defendant about the stolen money; which conversations witness related, and added that " he thought from Berry's remarks, that he knew where the money was."

Pending the trial, the Court adjourned for the night, and when about to adjourn, the presiding Judge inquired what should be done with the Jury? To which defendant's counsel replied that they were willing that the Jury should disperse, and the State also consenting, the Jury were allowed to disperse and go where they pleased until the Court convened.

The Jury returned a verdict of guilty.

Berry *vs.* The State of Georgia.

Whereupon the defendant moved an arrest of judgment, on the following grounds, to wit:

1st. Because the prisoner is indicted as principal, without stating in what degree ; whether in the first or second degree, and is therefore too general and not in the words of the Penal Code.

2d. Because the indictment charges that the prisoner entered the dwelling house in the night-time, without stating with what intent he entered said house.

3d. Because the indictment does not state that the prisoner, after having entered said dwelling house did steal anything therefrom.

4th. Because the indictment charges no facts that would make prisoner principal in the second degree.

5th. Because the bill of indictment contains no sufficient description of the property stolen.

All of which grounds were overruled by the Court, and the motion in arrest of judgment refused.

Whereupon defendant moved for a new trial, on the following grounds, to wit:

1st. Because the Court erred in permitting evidence to go to the Jury to prove that the negro Phil, in a confession or statement drawn from him by whipping, accused or charged the prisoner with receiving the stolen money in order to apply or explain the reply and conduct of the prisoner.

2d. Because the Court erred in permitting the counsel for the State to suppose in his argument to the Jury in conclusion, that the negro Tom, had also, when removed out of the prisoner's sight, made the same statement that Phil had made, and state that supposition to the Jury, without stopping the counsel or correcting any improper impression made on the minds of the Jury by such supposition, by-calling the especial attention of the Jury to such supposition in the charge of the Court to the Jury.

3d. Because the Jury found contrary to law and the charge of the Court.

4th. Because the Jury found a verdict contrary to evidence and without evidence.

5th. Because the Jury were allowed to disperse after they had heard the evidence, and remain so dispersed, without a bailiff, for several hours and to mix and mingle with the crowd, although it was done at the suggestion of defendant's counsel upon the asking of the question by the Court what should be done with the Jury.

6th. Because there was no sufficient proof as to the identity of the property stolen.

7th. Because there was no proof that the property was stolen from a dwelling house.

8th. Because proof that a trunk was taken and carried away, in which there was money and divers other things, does not sustain an allegation of taking and carrying away money.

9th. On the ground of newly discovered evidence contained in affidavits herewith presented.

With this last ground, was filed an affidavit of defendant, stating that he had discovered new testimony in his behalf, in this, that Samuel Stewart had been employed by the prosecutor to visit defendant, and by pretending friendship and offering him assistance, to endeavor to extract from him something that would lead to a discovery of his guilt, and that Stewart had also sent the negro Phil to talk with him, and had overheard the conversation, and that Stewart would testify that he had not heard nor obtained anything going to criminate defendant.

There was also filed an affidavit of John D. Dickinson, stating that he had heard the above facts from Stewart, and that Stewart was now sick with fever.

All these grounds were overruled by the Court, and a new trial refused.

To all which rulings of the Court defendant excepts.

ALEXANDER & JOHN W. H. UNDERWOOD, for plaintiff in error.

AIKEN & PEEPLES, representing WORD, Solicitor General, for defendant.

*By the Court.*—LUMPKIN, J. delivering the opinion.

This is an indictment which comes before us upon a writ of error from a judgment rendered in the Superior Court of Floyd County. On the plea of not guilty, the defendant, James Berry, was convicted by a verdict of the Jury. The charge was for stealing from the dwelling house of William Montgomery, two thousand dollars in gold and silver coin, five thousand dollars in bank bills, and three thousand dollars in promissory notes, all of the value of ten thousand dollars, the same being the property of one William Montgomery.

Counsel for the defendant moved, in arrest of judgment, and assigned as reasons,

*First.* Because the prisoner is indicted as *principal,* without stating in what degree.

The offence charged in the indictment constitutes the defendant a principal in the *first* degree. He is accused of being the actor or absolute perpetrator of the crime; if it had been intended to criminate him as principal in the *second* degree, the indictment would have charged, not that he stole the money and chattels, but that he was present, aiding and abetting the fact to be done; the indictment therefore is not only sufficiently technichal and correct, but it is in the very language and terms of the Code.

[1.] *Secondly.* Because the indictment charges that the prisoner entered the dwelling in the night time, without stating *with what intent* he entered the same.

Nor is it necessary that it should, where, as in this case, the stealing was consummated. Larceny from the house is defined to be, either the breaking or entering any house with an intent to steal, *or* after breaking or entering said house, stealing therefrom any money or thing of value. (*New Digest,* 794.) One may be guilty of this crime then, where the original entry was not felonious or *with an intent to steal.* Could the Jury who tried the case fail to comprehend readily the nature of the offence intended to be charged? If so, the indictment is sufficient. *Studstill vs. The State,* 7 Geo. R. 2.

*Thirdly.* Because the indictment does not state that the prisoner, after having entered said dwelling house, did steal anything therefrom.

It charges the prisoner after having feloniously entered the dwelling house of the prosecutor by night, with having "feloniously and privately taken and carried away" the money and notes specified in the indictment, "with intent to steal the same. The allegation could not have been more full and explicit.

*Fourthly.* Because the indictment charges no facts which make the prisoner principal in the *second* degree.

[2.] Nor is it attempted to convict him in that capacity. If it appears that an offence not capital, committed by a slave, has been done by the counsel, persuasion, or procurement or other means of a free white person, he or she shall be prosecuted for *the* offence, and if found guilty shall incur the same punishment as if he or she had actually committed the crime or misdemeanor with which the slave is charged. *New Digest,* 780.

If the facts which transpired in this case had occurred between the defendant and a free white citizen, Berry would have been guilty as principal in the second degree only, and the indictment should have been found accordingly ; but the design here is to charge Berry himself as guilty of the offence, because perpetrated by a negro through his procurement. The law institutes him in the place of the slave, and treats him as the actor or principal in the first degree. The same division of the Penal Code contains an analogous provision as to offences committed by infants under the age of ten years, by the influence of adults. *New Digest* 779, §7.

[3.] *Fifthly.* Because the indictment contains no sufficient description of the property stolen.

It is not necessary that it should be more particular in the description. In ninety-nine cases out of a hundred which occur, it is impossible to ascertain the precise coins or bills stolen. If a particular description was required to be given in the indictment, the proof must correspond and be equally definite. To hold this, we might as well say at once that all thieves shall go

clear, who steal coin or bank notes.    See *Bulloch vs. The State*, 10 *Geo. R.* 46.

It is our opinion then, that the Court was right in overruling the motion to arrest the judgment.

The defendant then by his counsel, moved for a new-trial, on the following grounds, to wit:

[4.] 1st. Because the Court permitted evidence to go to the Jury, to this effect, that the negro Phill, in a confession drawn from him by whipping, in the presence and by the consent of Berry, that he should tell all he knew, accused the prisoner with having procured the larceny to be committed by him and a fellow by the name of Tom, the property of Berry. This testimony was admitted for the purpose of explaining the reply and conduct of Berry, when thus impeached.

It is conceded, that by the Common Law of this State, (there being no statutory enactment upon this subject in Georgia,) a negro has never been permitted to give evidence in any case, where the rights of a white person were concerned.   And when we consider the degraded state in which they are placed by the laws, and the mental, as well as moral ignorance in which most of them are reared, not to advert to other reasons for excluding their testimony, it would be most unreasonable, as well as impolitic, to admit them as witnesses.

[5.] Nor shall we pretend to controvert the familiar rule, that confessions of guilt, extorted by either hope or fear, cannot be received either against the accused himself, or any one else. A confession thus obtained, however, if made by a free white citizen, and pointing to a distinct, substantive fact, from which guilt can be inferred or established, is competent proof.   2 *Stark. Ev.* 4 *part*, 49, 50, 51.

But the question here is, did the Court below err in refusing, under the facts of the case, to exclude the statements of Phill?   We are clear that it did not.   It is immaterial from what source, or under what circumstances the accusation was made, whether by a negro or a white man ; whether it was voluntary or induced by the flattery of hope, or the pain of punishment; whether it came from a talking ass, or a talking snake, a stock,

a stone or a stump, man, beast or reptile, animate or inanimate object, it is admissible as a key to, or explanatory of, what was said and done by the prisoner.

Suppose the defendant, instead of manifesting the emotion he exhibited when accused by Phill, and stating that he saw from the negro's countenance that he intended to criminate him, a self-accusation, indicative of conscious guilt, I repeat, instead of this agitation and self-condemnation, he had replied, "well, I confess the fact, but I will visit upon you the vengeance which I threatened in case you betrayed me," and with the knife which he held in his hands as he stood confronting the negro, while he was making this disclosure, he had made an effort to take his life, would any one doubt the admissibility of the charge accompanied with the confession which it elicited? Surely not. The objection then, is obviously to the *weight* of the evidence which is referable alone to the Jury, and not to its legality which is determinable by the Court.

Reject this testimony and several of our most important Penal Enactments become a dead letter. Conversations are overheard between a slave and a white man, in which a plot is laid for stealing, harboring or carrying off a slave, to a free State; is it not competent to give evidence of what was said by both of the speakers? We have a stringent Statute against trading with slaves. The owner of a slave loses a bale of cotton or some other article of value, suspecting that it has been sold to some one in the neighborhood, he causes his negro to be closely watched; and he is overheard a few nights thereafter, demanding payment of the purchaser, who acknowledges the liability and discharges it. Is it possible that the guilt of the offender could not be established upon evidence like this?

So with regard to gambling with slaves, selling or furnishing them with spirituous liquors, and all other offences in which our slave population are joint participaters. If I could find no precedent recognizing the propriety of such a rule, I should not hesitate to make one, from the absolute and indispensible necessity of the case. I have been so fortunate, however, as to lay my hand upon a direct authority upon this point.

Rebecca Hawkins, a free white woman, was tried in the State of Missouri, for poisoning her husband. Upon being confronted with a female slave, who assisted in administering the dose, the accused thus accosted her, " Mary, do you say I know anything about this matter ? " The girl answered, " yes, we all know about it ; I shall have to die, and I am not going to tell any more lies about it." The accused persisted in denying all knowledge of the matter. At a subsequent interview at the Sheriff's house, Mrs. Hawkins again accosting the woman said, " Mary, you have ruined us all." She replied, " don't say I have, mistress ; you know you sent Garster for the poison, and you sent Ned to Garster's for it ; and when it came, you told me to put some into a cup and bring it to you. I did so, and you poured some coffee in the cup ; Hawkins took the cup and drank its contents ; the poison was ratsbane."

The evidence was received on the trial, and from this judgment of the Circuit Court the defendant appealed, and assigned for error the admission of this testimony.

The Supreme Court say, " That negroes cannot testify against white persons, is clear." (The Circuit Judge was very explicit in so instructing the Jury, in the present case.) " But this rule cannot be carried so far as to exclude the conversation of a negro with a white person, when the conversation on the part of the negro is merely given in evidence, as an inducement and illustration of what was said by the white person. If the conversation of the negro had been proved by herself, then it would clearly have been illegal. Here the State proved by competent witnesses, that certain remarks were made to the plaintiff in error, in order to show what her reply was. It is a matter of indifference by whom they were made. It is a fact which may be proved, like any other fact in the case."

[6.] 2d. The next ground taken in the application for a new trial is, that the Court erred in permitting the State's counsel, in his concluding argument to the Jury, *to suppose* that the negro Tom, the property of Berry, and who was implicated with his master, as an accomplice in the larceny, had, when removed out of the prisoner's presence, corroborated the statements of Phil,

as to Berry's guilt.   It is contended that it was the  duty of the
Court to have stopped the counsel or to  have disabused the minds
of the Jury, by way of charge, from the improper impressions
thus produced.

It is due to the  presiding Judge, to mention that he states in
the bill of exceptions, that  the irregularity complained of, esca-
ped his notice, and  that in  his general charge  to the Jury, he
instructed them expressly to disregard  any  and all  statements
made by counsel, which were not supported by the evidence.

That the  practice  complained of is  highly reprehensible, no
one can doubt.   It ought in  every instance  to be promptly re-
pressed.   For counsel  to undertake by a  side wind, to get that
in as proof which is merely  conjecture, and thus to work a pre-
judice in the mind of the  Jury, cannot be tolerated.   Nor ought
the  presiding Judge to wait until he is  called on  to interpose.
For it is usually better to trust to the discrimination of the Jury
as to what is, and what  is not, in  evidence, than  for the oppo-
site counsel to move in  the matter.   For what practitioner has
not regretted his untoward  interference, when  the counsel thus
interrupted, resumes,  " yes, gentlemen, I have  touched a tender
spot, the galled jade will wince ;  you see where the shoe pinch-
es."

Is it, I ask, worthy of the noblest of professions thus to sport
with the life, liberty,  and fortune of  the citizen ?   A profession
which is the great repository of the first talents in  the  country,
and to whose standard the most gifted habitually flock, as offer-
ing  the highest inducements  of reputation, wealth, influence,
authority and power, which the community can bestow.

I would be the last man living, to  seek to abridge freedom of
speech, and no one witnesses with  more unfeigned pride and
pleasure than myself, the  effusions of forensic eloquence, daily
exhibited in our Courts of  Justice.   For the  display of intellec-
tual power, our *bar* speeches are equalled by few, surpassed by
none.   Why, then, resort to such a subterfuge ?   Does not  his-
tory, ancient and modern—nature, art, science and philosophy—
the moral, political, financial, commercial and legal—all open to
counsel, their rich  and  inexhaustible treasures, for illustration ?

Here, under the fullest inspiration of excited genius, they may give vent to their glowing conceptions, in thoughts that breathe and words that burn.   Nay more, giving reins to their imagination, they may permit the spirit of their heated enthusiasm to swing and sweep beyond the flaming bounds of space and time—*extra flammantia mœnia mundi.*   But let nothing tempt them to pervert the testimony, or surreptitiously array before the Jury, facts which, whether true or not, have not been proven.

*Thirdly.* Another ground occupied in the motion for a new trial was, because the verdict of the Jury was contrary to law and the charge of the Court.

[7.] Whether the verdict was contrary to law, will depend upon the conclusion to which we shall come at the close of this case.   In what sense the Jury are *judges* of the *law* in criminal cases, is an interesting inquiry, which, owing to the unavoidable length of this opinion, we shall reserve for future investigation.

The entire charge of the Court, not having been incorporated in the record, we have no means of ascertaining certainly whether the verdict was contrary to the charge or not.   So much of it as is given, is not in conflict with the verdict of the Jury.

[8.] *Fourthly.* Because the verdict was contrary to evidence, and without evidence.

In addition to the conduct and response of Berry, when accused by Phil, he refused to have his foot measured to see whether it corresponded with the tracks which were made, saying " it was enough to make a white man's blood boil, to measure his foot;" notwithstanding all the rest of the company present had promptly submitted to the proceeding.   He maintained the innocence of his man Tom, exhorting him to tell all he knew, but declaring at the same time, in the hearing of the boy, that he knew nothing about the matter ; for that he saw him working in his patch, a distance of from one hundred and fifty to two hundred yards from Berry's house, at 11 o'clock on the night when the things were stolen ; whereas every circumstance pointed to Tom as the coadjutor of Phil, in conveying the trunk to the lane, where it was plundered of its contents.   Again, he assigned a

false reason for the speedy departure from home of his son Richard, soon after the offence was committed—stating that the ground was too wet for him to plough, which was not true.   He feigned ignorance of the whole affair, when it was first communicated to him that Montgomery's money was stolen.   He said he had not heard a word of it, although he lived on the same public highway and within a few miles of Montgomery.   But forgetting himself, he subsequently remarked, in the same interview with the witness, who deposed to the previous conversation, that he and his wife " were talking about it last night, and we thought the money was stolen Sunday night, when Mr. Montgomery and his wife were at Rome attending meeting."

Besides all this, the witnesses traced the tracks of a horse and mule, to where they had been tied in the woods about two hundred yards from the road where the trunk had been found.   The horse was shod, and upon being measured, the tracks fitted the feet of Berry's horse and mule.   So also, did the black hair which had been rubbed off on a shrub where the horse was fastened, correspond in color with that of the horse.

It cannot, therefore, with any propriety be affirmed, that the verdict of the Jury was *without evidence*.   As to its sufficiency, it does not become us to express our opinion.   The rule is well settled, that the Jury alone have the power to determine upon the force and effect of the circumstances proved, and whether they are sufficient and satisfactory to warrant them in finding the defendant guilty or not.   1 *Phil. Ev.* 156.   2 *H. Black. R.* 297.   6 *Peters' R.* 598.   2 *Stark. on Ev.* 681, to 683.

[9.] *Fifthly.* The next ground taken for a new trial is, that the Jury were allowed to disperse for the night, without a bailiff, after they had heard a portion of the evidence, and to mix and mingle with the community, although it was done at the suggestion of defendant's counsel, upon an inquiry being made by the Court, " what should be done with the Jury ? "

Ordinarily, it is the duty of the Court to keep the Jury together in a criminal case, from the time it is submitted to them, until they are finally discharged from its consideration.   And no application should be addressed by the Court to counsel, to allow

the Jury to disperse. It is odious to refuse and calculated to prejudice the party with the Jury who withholds his consent. Counsel are placed under a species of moral duress.

[10.] Should the attorneys on both sides unite in asking this indulgence or relaxation of the law, there would, in that event, be no impropriety, perhaps, in granting it, at least in the trial of petty offences. But knowing the temptation to tamper with Juries, and the difficulty, yea, I might say the utter impossibility of preventing them from being intermeddled with, it is a discretion which should be very cautiously exercised, under any circumstances.

[11.] The administration of justice should not only be pure, but above suspicion.

And it is the less necessary since the passage of the Statute allowing the Jury to be furnished at their room with all proper refreshments and comforts, during their deliberations.

And although the separation in this case was by the authority of the Court, and upon the consent of counsel, yet, if the defendant could have shown that any improper communication had taken place between any of the Jury and other persons during their dispersion, we should have held it good cause for awarding a new trial. He made no such attempt, neither was there any misconduct imputed to the Jury while they were separated.

[12.] *Sixthly.* Because there was no sufficient proof as to the identity of the property stolen.

This is virtually the same point as that taken in the fifth and last ground of the motion to arrest the judgment.

If the charge in the indictment that the defendant stole gold and silver coin of the value of two thousand dollars, and bank notes of the value of five thousand dollars, &c. is from the necessity of the case all the allegation of property and value that the law requires, as we hold that it is, then the evidence need not be more particular. It is not necessary to prove that so much of the coin were Washingtons or eagles, or half eagles, or Spanish milled dollars, or American half dollars, or that the bank

notes were each of such a date, issued by a particular bank and payable to some certain person.

A gentleman recently died in this State with upwards of seventy thousand dollars of cash in his house, all of which, except about eight thousand dollars, was in specie; and among the rest, several half bushels of dimes. How impossible for the owner who was years in hoarding up this treasure, much more so for his representative, to have alleged and proved each particular piece of money or paper, had the box or boxes which contained it been stolen.

[13.] *Seventhly.* Because there was no proof that the money was stolen from a dwelling house.

William Montgomery testified that on the night of the 17th April, 1850, his house was opened and a large trunk taken out from the room where he *usually* slept, and where his wife was sleeping at the time—he having occupied another apartment in the same dwelling that night on account of the sickness of his wife; that the trunk contained between seven and ten thousand dollars in money—two thousand in gold and silver and upwards of five thousand in bank notes, besides promissory notes amounting to between three and four thousand dollars; that the trunk was taken two or three hundred yards from the house, broken open and rifled of its contents.

This extract from the testimony of the prosecutor, is the only reply which we deem it necessary to make to this objection.

*Eighthly.* Because proof that a trunk was taken and carried away, in which there was money and divers other things, does not sustain an allegation of taking and carrying away money.

The testimony shows that the trunk and the title deeds to property were left, while the money was abstracted and carried off: and this establishes the *quo animo* with which the trunk was taken—that it was *ab initio*, the kernel the rogue was after, and not the shell.

[14.] *Ninthly.* A new trial was insisted upon, on the ground of newly discovered evidence.

The witness, Samuel Stewart, had been employed by the prosecutor, to pretend friendship and proffer assistance to Berry, and

thus endeavor to draw from him something that would tend to a discovery of his guilt. Stewart, in furtherance of this plan, had sent the negro Phil to counsel with Berry, while he listened in secret to what passed between them; and Berry swears that Stewart will testify, that he neither saw nor heard any thing which would lead to his conviction. Berry, in addition to his own, filed the deposition of Dr. J. D. Dickerson, who states that "*long before the trial,*" Stewart communicated to him the foregoing facts. He further swears, that Stewart "*was sick of fever*" when his (Dickerson's) deposition was taken.

Applications for new trials on account of newly discovered evidence, are not favored by the Courts. In South Carolina it has been repeatedly held, that new trials will not be granted on this ground alone. *Buchanan vs. Carolin,* 1 *Brevard,* 185. *Faver vs. Baldwick,* 3 *Brevard,* 350. *Evans vs. Rogers,* 2 *N. & M.* 563. *State vs. Harding,* 2 *Bay.* 267.

Upon the following points there seems to be a pretty general concurrence of authority, viz : that it is incumbent on a party who asks for a new trial, on the ground of newly discovered evidence, to satisfy the Court, 1st. That the evidence has come to his knowledge since the trial. 2d. That it was not owing to the want of due diligence that it did not come sooner. 3d. That it is so material that it would probably produce a different verdict, if the new trial were granted. 4th. That it is not cumulative only—viz; speaking to facts, in relation to which there was evidence on the trial. 5th. That the affidavit of the witness himself should be produced, or its absence accounted for. And 6th, a new trial will not be granted, if the only object of the testimony is to impeach the character or credit of a witness. *The Commonwealth vs. Murray,* 2 *Ashmead,* 41. *The Commonwealth vs. Williams, Ibid,* 69. *Smith vs. Matthews,* 6 *Miss. R.* 600. *Robins vs. Fowler,* 2 *Pike,* 133. *Glover vs. Woolsey, Dud. Geo. R.* 85. *Middleton vs. Adams,* 13 *Vermont,* 285. *McIntire vs. Young,* 6 *Black.* 496. *Harbour vs. Rayburn,* 7 *Yerg.* 432. *Cosart vs. Lisle,* 1 *Meigs,* 65. *Mechanic's Fire Ins. Co. vs. Nichols,* 1 *How.* 410. *Hinds vs. Terry, Walker,* 80. *Kirby vs. Walford,* 14 *Vermont,* 414. *Comming vs. Walden,* 4 *Black.*

307.   Commonwealth vs. Flanagan, 7 Watts & Serg. 415.   Ter-
rece vs. The Protection Ins. Co. 11 Ohio, 147.   Den vs. Winter-
mate, 1 Green. 177.   McGavock vs. Brewer, 4 Humph. 251.
Gardner vs. Mitchell, 6 Pick. R. 114.   Chambers vs. Chambers, 2
A. K. Marshall, 348.   Alsop vs. Ins. Co. 1 Simmons, 451.   Pike
vs. Evans, 15 Johns. R. 210.   Webber vs. Ives, 1 Tyler, 441.
Chambers vs. Brewer, Cooke, 292.   Lester vs. The State, 11 Con.
R. 15.   Knox vs. Work, 2 Brim. Rep. 582.

Tried by these tests, this showing is strikingly deficient in
several important particulars.   It does not appear from the affi-
davits accompanying this motion, that the materiality of Stew-
art's testimony came to the knowledge of the defendant since
the trial.  ˉ He does not so swear, and from the statement of
Dr. Dickerson, that the facts which it is proposed to prove by
the witness, were imparted to him " long before the trial," we
may infer that Mr. Berry was in possession of them previous
thereto.   It is enough at least, that he does not negative this
hypothesis.   It should appear affirmatively that he has not.

But is the testimony material?   Would it be likely to change
the verdict which has been rendered ?   In the first place, we
are inclined to think it would be inadmissible if offered.   It es-
tablishes nothing.   The witness would swear, that notwithstand-
ing he sought and obtained opportunities favorable for that pur-
pose, yet, he neither saw nor heard any thing calculated to
criminate Berry.   Testimony like this, would not weigh a feath-
er, even if it were competent.

In the next place, why was not the affidavit of Stewart him-
self produced ?   Dr. Dickerson states, it is true, that at the
time his deposition was taken, Stewart was sick of fever.   Does
this fact sufficiently account for its absence, or excuse its non-
production ?   One may be sick of a fever, and yet abundantly
able to qualify to a deposition.   He resided in the place where
the trial took place, and the record does not show that he was
too unwell at all times thereafter, to give his affidavit.

During the progress of the trial, John Sale was sworn as a
witness in behalf of the State.   He testified, that he had had
several conversations with Berry, respecting this theft.   In one

of them, Berry said that he would like to compromise with Montgomery ;. that the money would never be got out of him, unless it was whipped out. Witness added, that from what Berry said, " he thought he knew where the money was."

Counsel for the defendant objected to the opinion or belief of the witness. The objection was overruled, and the testimony allowed. Which decision was excepted to, and the same is now assigned as error.

[15.] It is an elementary principle of the law of evidence, that the understanding and opinion of witnesses are not be received, except in matters of science, and a few other special cases resting upon particular circumstances.   *McKee vs. Nelson,* 4 *Cowen,* 355.   *Murray vs. Bethune,* 1 *Wend. R.* 196.

[16.] It is the business of witnesses to state facts, and it is the province of the Jury, under the direction of the Court, to draw such inferences and conclusions from these facts, as in their judgment they will warrant.   *Twelve* men and not *one,* are to determine the matter in issue.   6 *Cowen,* 162.

[17.] And yet, there are a variety of cases in which a witness is permitted to give his opinion in evidence, in connection with the facts upon which it is founded.

[18.] In cases of insanity, this practice is now generally, if not universally admitted. 3 *Stark. Ev.* 1707, *note* 2, *and cases cited. Lester vs. Pitsford,* 7 *Vermont,* 158.   *Clarke vs. State,* 12 *Ohio R.* 483, *cited in* 7 *Law Reporter, No.* 7, *title Insanity.*

[19.] In *The Commonwealth vs. Thompson et al.* (3 *Dana,* 301,) a witness called to prove the sufficiency of sureties, having stated that at the date of the bond, they owned estate exceeding its amount, added, "then he considered them good." Objection was made to the latter portion of this testimony, as no more than the opinion of the witness.   The Court of Appeals say, "after the witness had stated the fact that the sureties owned property exceeding in value the amount of their liability, his "*considering*" them good, should have been deemed to have been a deduction from the fact which he had thus affirmed.

In *Gentry vs. Polly McMinnis,* (*Ibid,* 383,) the question was one of freedom or slavery. In the course of the trial, the *iden-*

*tity* of the party was a material fact.   The Circuit Judge refused to withdraw from the Jury the opinion of one of the witnesses upon this subject, accompanied as it was with the facts upon which it was founded.   And upon writ of error, the judgment was affirmed.   Chief Justice *Robertson* remarked, that "the *opinion* as to the identity of the defendant, was a deduction from the facts given in evidence."

In *Griffin vs. Brown*, (2 *Pick. R.* 303,) the question of insolvency arose collaterally, and a deponent stated, that from his knowledge of the debtor's circumstances, he was able to pay a debt of a certain amount ; that during a certain period after his escape from Massachusetts to New York, he must have spent a very large amount of money—from 800 to 1000 dollars—as the deponent *verily believed.*   It was held that this testimony was admissible, not being opinion merely, but reasons given for a fact stated by the deponent.

In *Mahony vs. Ashton,* (4 *Harris & McH.* 63,) the deposition of John Wheat was rejected, because the same contained the opinion *merely* of the witness, uncoupled with the facts from whence his conclusions were drawn, or opinion formed.

In *Morse vs. The State,* (6 *Con. R.* 9,) the point in controversy was as to the age of one VanGrandt.   William Oaks stated, that he should think from his appearnce that he was a minor between the age of fourteen and seventeen years. Upon writ of error, the Supreme Court of Connecticut held, that the testimony of Oaks was inadmissible.   " It was," says *Hosmer*, Chief Justice, " opinions entirely abstracted from fact.   Had the witness testified to the facts indicative of Van Grandt's age, and accompanied them with his belief or opinion, I should have considered the testimony competent."

In *Burt vs. Garvin,* (4 *Harr. & Johns.* 507,) a part of the testimony of Dorsey, the witness, was, that the sum of $150 retained by Wallis, as he (witness) " *understood and presumed,*" was about the sum intended to be charged for discount upon the said note :  *Held,* that the expression, as he (witness) "*understood and presumed,*" taken alone and unconnected with other words used by him, imparted his opinion merely, and were in themselves in-

admissible; but that they could not be separated from the other portion of the testimony, without doing more mischief than the retaining of them would do.

It would seem, then, that while with a few excepted cases, the *mere opinion* of the witness, unaccompanied with the facts upon which it is founded, is inadmissible evidence, that in a great variety of other cases it is not illegal to admit it, provided it be coupled with the facts upon which it is founded; and in no case do I find the testimony rejected, provided the deposition sets forth the facts from which the opinion is deduced.

Under these circumstances, is it possible to draw a line of demarcation? To state definitely in what cases the belief of the witness may be expressed, and when it must be excluded?

[20.] Perhaps the distinction should be this—although I am free to confess that I find none such drawn in the books—that where the question at issue is one of *opinion merely*, as that of sanity or insanity, solvency or insolvency, personal identity, handwriting, age, &c. that in all such cases it should be allowable for the witness to give *his opinion* in connection with the facts upon which it is founded. For in all these cases, the conclusion of the witness is the result of a thousand nameless things, alike frequently inexplicable and incommunicable.

[21.] But where *matters of fact* are to be tried—as contracts, crimes, torts, trespass on the case, and such like—that then the testimony should be restricted to words and facts only—repudiating entirely the opinion or belief of the witnesses.

[22.] Looking to the *nature of the investigation,* is not this distinction founded in good sense and the nature of things?

Applied to the case at bar, this rule would of course exclude that portion of the testimony of Mr. Tate, which was objected to. But it is not a matter of sufficient importance to justify us in setting aside the verdict. It could not change the complexion of the case. Nor do I feel authorized to apply this test, until it has received the sanction of a majority, at least, of the Court, if it ever shall.

A new trial must be denied.