UNITED STATES of America

v.

Travis A. LEARY, Appellant.

United States of America

v.

Paul J. Leary, Jr., Appellant.

Nos. 05–3624, 05–3658.

United States Court of Appeals,
Third Circuit.

Argued: July 10, 2006.

Filed: Dec. 1, 2006.

Colm F. Connolly (Argued), Ferris W. Wharton, Office of United States Attorney, Wilmington, DE, for Appellee.

Edmund D. Lyons, Jr. (Argued), The Lyons Law Group, Wilmington, DE, for Appellant Travis E. Leary.

Charles M. Oberly, III (Argued), Oberly, Jennings & Rhodunda, Wilmington, DE, for Appellant Paul J. Leary.

Before: SLOVITER, McKEE and RENDELL, Circuit Judges.

## OPINION

McKEE, Circuit Judge.

Paul and Travis Leary appeal their convictions for arson and conspiracy following their joint jury trial. For the reasons that follow, we will affirm.

### I. Discussion.

The background of this case is set forth in the district court's careful and thorough opinion and need not be repeated here except insofar as may be helpful to our discussion. *See United States v. Leary,* 378 F.Supp.2d 482, 484–487 (D.Del.2005). Given the district court's thorough analysis, we need only briefly address each of the arguments asserted by the defendants.

### A. Refusal to Immunize Richie Bryant

■ Both Travis and Paul Leary claim they are entitled to a new trial based upon the district court's refusal to immunize Richie Bryant. We review a district court's refusal to immunize a possible de-

fense witness for abuse of discretion. *United States v. Herman,* 589 F.2d 1191, 1213–14 (3d. Cir.1978); *see also Government of the Virgin Islands v. Smith,* 615 F.2d 964 (3d.Cir.1980). In *Herman,* we specifically noted "our governmental system's strong tradition of deference to prosecutorial discretion" in granting immunity while noting that the dynamics of the adversarial process are such that there is a tendency to exercise that discretion "in ways that make it more likely that defendants will be convicted." 589 F.2d at 1203. We also explained that a district court may be required to immunize a potential defense witness where the government has denied use immunity with the "deliberate intention of distorting the ... fact finding process," or when the witness's testimony "is essential to an effective defense." *Id.,* at 1204. Neither of those circumstances was present here.

The defendants do not claim that the government's opposition to immunizing Bryant was motivated by prosecutorial misconduct intended to distort the fact finding process. *See* Travis Leary's Opening Br. at 24–7, and Paul Leary's Opening Br. at 37 (adopting Travis Leary's argument regarding Bryant's testimony). Rather, they argue that Bryant's testimony was essential to their defense. We do not agree. As the district court explained, although it can be argued that Bryant's testimony would have been helpful to the defense, it was not essential to it, nor did the absence of the testimony distort the defendants' trial. *See* 378 F.Supp.2d at 497.

> Even if Mr. Bryant had testified exactly as the defendants hoped,[1] i.e., ... that would have confirmed Travis's testimony ... but it would not have addressed the defendants' culpability for the crime of arson.... [T]he hoped for testimony of Bryant went primarily to blunt the implication that the Learys created the false document to generally support their credibility ... It was therefore not exculpatory in a meaningful way and cannot fairly be called essential to the defense. The Government's opposition to the defense request for immunity did not result in a serious danger of a miscarriage of justice and therefore is not a basis for a new trial ...

378 F.Supp.2d at 498 (footnote in original) (citing *United States v. Brennan,* 326 F.3d 176, 189 (3d Cir.), *cert. denied,* 540 U.S. 898, 124 S.Ct. 248, 157 L.Ed.2d 178 (2003)).

### B. Danielle Donovan's Testimony & Newly Discovered Evidence.

■ Paul Leary argues that he is entitled to a new trial based upon newly discovered email between Danielle Donovan and Travis Leary as well as an affidavit obtained from Travis after the trial.

At trial, Donovan testified that she had dated Travis for approximately 3 months, from October to December of 2002. She also stated that she spoke to Travis around 10:50 p.m. on the night of the fire. During that call, Travis purportedly told her that "he was done, and he was heading over to his brother's house." According to her testimony, she heard the distinctive sound of Travis' car in the background during that call. That was inconsistent with statements she had given investigators before trial. The testimony also contradicted the Learys' claim that they left the restaurant between 10:00 and 10:15, thus under-

---

1. That was a slim prospect indeed, as it would have required Mr. Bryant to incriminate himself and thus, even if immunized from prosecution, to destroy his personal and business reputation, which, judging from his reaction to being subpoenaed he was not in the least inclined to do.

mining their alibi defense.[2] Donovan had been interviewed by government investigators numerous times before trial, and never once said anything about a phone call from Travis at 10:48 or 10:50 the night of the fire. In fact, she had consistently maintained that she had gone to sleep early the night of the fire and only awoke when told of the fire at 11:30 that evening.

Shortly after the verdict was returned, Paul Leary moved for a new trial relying in part on the after-discovered emails and Travis' affidavit. The emails establish that Donovan and Travis Leary continued a sexual relationship for at least a year after the date Donovan testified to during the trial. They also show that Donovan was in love with Travis and profoundly disappointed with how the relationship ended. They contradict the government's portrayal of her as someone who "married somebody else [and] moved on in her life." In his affidavit, Travis Leary claimed that Donovan had confronted him in his home and accused him of being the father of her unborn child and "ruining her life." According to Paul Leary, this new evidence establishes that Donovan lied during her trial testimony and entitles him to a new trial.

The parties do not agree on the test that should be applied to this newly discovered evidence. The government argues that the test first articulated in *Berry v. State*, 10 Ga. 511 (1851) (the *"Berry* test") is the proper test. That test requires each of the following inquiries be satisfied before newly discovered evidence constitutes grounds for a new trial:

1. The evidence must have been discovered after the trial;

2. The failure to learn of the evidence must not have been caused by defendant's lack of diligence;

3. The new evidence must not be merely cumulative or impeaching;

4. It must be material to the principal issues involved; and

5. It must be of such a nature that in a new trial it would probably produce an acquittal.

*United States v. Meyers*, 484 F.2d 113, 116 (3d Cir.1973).

Paul urges us to reject the *Berry* test and instead apply a test based upon *Larrison v. United States*, 24 F.2d 82, 87 (7th Cir.1928), *overruled by United States v. Mitrione*, 357 F.3d 712 (7th Cir.2004). Under the *Larrison test*, a defendant need only show that: "(1) A material witness gave false testimony; (2) Without the false testimony, the jury might have reached a different verdict; and (3) The defendant did not know the testimony was false until after the trial." *United States v. Massac*, 867 F.2d 174, 178 (3d Cir.1989).

We have previously noted that "the *Larrison* test has not been adopted by this Court," *Government of Virgin Islands v. Lima*, 774 F.2d 1245, 1251 (3d Cir.1985). However, we have not explicitly adopted either test, and we need not do so here because we do not believe a new trial is warranted under either test.[3]

The district court correctly concluded that the new evidence of the Dono-

---

2. Paul does not deny that the conversation took place. Indeed, as the district court noted, he can not because it is corroborated by Travis' phone records, and Travis testified about the call. However, according to Travis, he was "sitting in his home, not driving home in his car[ ]" when the call occurred. 378 F.Supp.2d at 491, n. 15.

3. Although we do not resolve the issue of which test to apply, we do note (as did the district court) that the *Larrison* test has even been rejected by the court of appeals that initially adopted it. *See United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir.2004).

van/Leary affair does not satisfy the last three requirements of the *Berry* test. *See United States v. Leary,* 378 F.Supp.2d 482, 490–94 (D.Del.2005). It fares no better under the *Larrison* test.

Donovan undoubtedly gave false testimony regarding the duration of her relationship with Travis. However, the jury already had substantial grounds to reject the accuracy and/or veracity of her testimony regarding the 10:48 and 10:50 p.m. phone calls. During cross-examination, defense counsel forced Donovan to admit that she had consistently stated that she could not remember either call during any of the numerous interviews she had given to government investigators before trial. Rather, she steadfastly denied any recollection of the calls. When she testified under oath before the grand jury, she had testified that "she called Travis earlier in the evening, went to bed, and did not speak to him again until around 11:30 p.m., after the fire had been discovered." *Leary,* 378 F.Supp.2d at 491. As we just noted, at trial she not only remembered the two calls, she also recalled the sound of Travis' Mustang and his statement that he had just finished working and was going to Paul's house. *Id.* That testimony supported the government's case by undermining the defendants' alibi and placing Travis (and presumably Paul) in the restaurant alone closer to the start of the fire.

Nevertheless, the district court rejected Paul's assertion that Donovan's testimony was perjury *per se.* The court explained: "A recollection recovered in the courtroom for the first time may be troubling but is not necessarily false." *Id.,* at 491. The court concluded that the newly discovered emails constituted "purely impeaching [evidence] . . . on a collateral matter." *Id.,* at 491. We agree.

The emails do nothing more than establish that Donovan may well have had a motive to lie to get back at Travis based upon her personal feelings about him. Any such motive would be classic impeachment material. Moreover, the district court's inquiry did not end merely because the emails only constituted impeachment material. The court recognized that "there is precedent indicating that impeachment evidence alone may sometimes be a basis for a new trial." *Id.,* at 492 (*citing United States v. Wong,* 78 F.3d 73, 79 (2d.Cir.1996)). The court explained that, under *Wong,* impeachment evidence can be material and support a new trial if that witness's testimony furnishes the only evidence of guilt or "would have undermined a critical element of the prosecution's case." *Id.,* at 492 (internal quotation marks omitted). The first condition is clearly not satisfied here. This verdict here is not significantly undermined because, as we explain below, the evidence here, including the alibi, still establishes that this fire was set by the Learys. The alibi the defendants attempted to rely on allowed the jury to tie both of them to the arson if it rejected the alibi of either.

Although Paul insists that the government's case cannot stand if the jury rejected evidence about the two late phone calls, we disagree. That would only have narrowed the time the defendant's had to set the fire, it would not have eliminated their opportunity to do so, or made their guilt so impractical as to raise a reasonable doubt about the identity of the arsonist(s) given the totality of the evidence. As the district court quite correctly concludes, "[T]he heat generated between Travis and Ms. Donovan sheds no light whatsoever on *who* burned down the . . . Restaurant." *Id.,* at 490–91 (emphasis added). "Who" was, of course, the only issue here. As we explain with more specificity below, given the evidence of the defendants' guilt, neither Donovan's courtroom epiphany nor

and the undisclosed emails undermines the jury's verdict as much as Paul's argument suggests.

Moreover, defense counsel skillfully focused on Donovan's inconsistent testimony in his closing argument. *See* 378 F.Supp.2d at 493 (defense counsel "[i]n close and extensive questioning ... made skillful use of Ms. Donovan's [inconsistent] statements, highlighting the contradiction with her trial testimony.").

Even assuming that the jury believed Donovan's testimony despite the contradictions, and assuming that the jurors would have chosen to discount that testimony once they learned the truth about Donovan's relationship with Travis, the verdict is still supported by other evidence of the Learys' guilt as detailed below.

### C.  Ashley Ford's Time Records

■ Both defendants claim that the government's failure to disclose Ashley Ford's time records requires a new trial under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The government denies that those records constitute *Brady* material while expressing regret that they were not disclosed given the open file discovery that occurred. Although we agree that it would have been preferable to disclose these records, we also agree that they are not exculpatory. According to the defendants, the records are important because they allow the jury to conclude that Shawn Naylor left the restaurant earlier than he testified to. They argue that this is significant because it would have been more consistent with their alibi. However, Naylor did not testify that he picked Ford up from her job as soon as she got off. Rather, he testified that he was meeting her at his house and then going to Delaware Park. Although he thought that he remembered leaving the Yankee around 10:00 or 10:15 and seeing

the defendants there at a time that was inconsistent with their alibi, his testimony is not undermined because Ford got off work a half hour earlier than Naylor thought. Since he was meeting Ford at his house, his departure from the restaurant was not so directly tied to her leaving work that it undermined his time frame. Moreover, even if we assume that Naylor was 30 minutes off about the time he left the restaurant, we are not persuaded that the time difference has the exculpatory impact the defendants suggest. Although that 30 minute adjustment may have been helpful to the defense because it did not place the brothers at the scene later than claimed by their alibi, the district court realized that, "less incriminating is not exculpatory." 378 F.Supp.2d at 496 (internal quotation marks omitted). The court realized that the issue presented by these records was "whether the undisclosed evidence creates a reasonable doubt that did not otherwise exist ... or whether there is a reasonable probability that the evidence would have changed the result." *Id.* We agree that this evidence does not have that import.

It must be remembered that the time of the fire was not established with mathematical precision. It undoubtedly started before 11:30 pm when Donovan was awaken and told about it, and it certainly started sometime after 9:30. That is the earliest Naylor left the restaurant based upon the defendants' view of the significance of the undisclosed time records. According to Travis's testimony, he and Paul "left the restaurant at about 9:50 p.m. (4/18/05 Tr. at 211–12, 220–21), and drove the short distance to Travis's house," where they remained "until Paul went to ... home about an hour later" leaving Travis alone at his home. 378 F.Supp.2d at 491. Naylor's testimony is totally consistent with Travis' if Naylor left before 9:50, but the

Learys' alibi is not fatally undermined if Naylor actually left between 10:00 and 10:15 as he testified. That would simply mean that Travis was about ten minutes off in April 2005, when he tried to recall the time he left the restaurant on the night of the fire 3 years earlier. Moreover, the defendants were able to argue that an ambiguous notation ("9:45") in notes agent Gemmato made of an interview of Naylor a couple of days after the fire actually established that Naylor had said he left the restaurant at 9:45 not at 10:00 or 10:15 pm as he testified. Therefore, to the extent that defendants claim their alibi rested on the accuracy of the time frame now at issue, there was certainly an opportunity to make the same argument that they claim they could not effectively make without the undisclosed time records.

### D. The Alleged Manipulation of Shawn Naylor.

■ In a related claim, the defendants argue that the government manipulated Naylor's testimony to achieve a time line that would undermine their alibi. This argument is based on Agent Gemmato taking notes but not writing a report of the first interview of Naylor shortly after the fire, and the agent's failure to allow Naylor to review those notes prior to a subsequent interview. It largely focuses on the aforementioned entry of "9:45" that the agent recorded during the first interview and the failure to allow Naylor to refer to that time frame before conducting the second interview.

This argument is based on nothing more than speculation about the significance of "9:45" in the agent's notes. Moreover, as we just noted, Naylor was confronted with the agent's notes when he testified at trial and asked if he could have been mistaken about the time he left the restaurant based upon that notation. He did not change his

testimony, and the district court correctly rejected the defendants' attempt to elevate that ambiguous notation into a claim that the interest of justice requires a new trial.

### E. Pamela Barrell's Testimony.

■ The defendants claim that Pamela Barrell's testimony "was riddled with inconsistency, defied common sense, and should have been disregarded by the jury." Paul Leary's Opening Br. at 40. The defense aggressively and ably attacked Barrell's sobriety, opportunity to observe and honesty during very aggressive cross examination. The district court gave the following account of her testimony:

Ms. Barrell's statement placing Travis Leary's car, and by inference Travis Leary himself, at the scene of the fire at nearly 10:30 p.m. was the subject of intense defense efforts at impeachment. For example, the defendants were permitted to call to the stand two other waitresses who had worked with Ms. Barrell to try to establish that she was an habitual cocaine user and to thereby imply that she was under the influence of cocaine on the night of the fire and unfit to make the observations she claimed to have made. They called an expert to testify about the effects of cocaine and alcohol on perception. They called a private investigator to testify about the distance from the point that Ms. Barrell said she saw Travis's car to the point where she said it was parked and to describe the line of sight and the impediments to observation along that line of sight. Most significantly, they subjected Ms. Barrell to a lengthy and vigorous cross-examination during which they challenged her veracity with, it seemed, every piece of information and every inference at their disposal. Despite all of this, Ms. Barrell's testimony remained basically consistent with what she had told investigators on the first

occasion when she was interviewed a few days after the fire: that she saw Travis's car behind the Yankee at approximately 10:30 p.m.

378 F.Supp.2d at 499. Accordingly, the district court concluded: "On the key aspect of her testimony, then, Ms. Barrell's testimony was not 'riddled with inconsistence.' It was, on the contrary, in line with the statement she gave to investigators at a time when the evidentiary significance of 10:30 p.m. was unlikely to have been apparent to her." *Id.* at 499–500. We agree.

### F. The Interest of Justice.

■ Both defendants point to shortcomings in Agent Gemmato's investigation, arguing that, in the interest of justice, their conviction should not be allowed to stand. *See* Paul Leary's Br. at 47–48. These include the failure to inquire about a broken window at the restaurant, not investigating a statement about two men in a blue car, not recording certain interviews, not producing a report of the fingerprint analysis of the cash box, not testing the Learys' shoes, not testing the Mustang for evidence of accelerants, not testing unburned areas of the gasoline containers for fingerprints, etc. *Id.* Agent Gemmato conceded that some of these steps should have been taken, and we agree that the prosecution may have been on firmer footing had these additional things been done; but they weren't. The jury's task was not to critique the investigation that was conducted or to determine guilt or innocence based upon the quality of the investigation. The jury could clearly consider the quality of the investigation in weighing the evidence, and there is no reason to infer that any shortcomings in the investigation was lost on the jurors. This is especially true in this age of televised crime shows featur-

ing state of the art investigations and forensic science. The jury concluded that the investigation that was conducted produced sufficient evidence that the defendants were the arsonists to prove their guilt beyond a reasonable doubt, and the district court correctly rejected the invitation to second guess that verdict.

### 5. The Totality of the Alleged Errors

The defendants' argument infers that the interest of justice requires a new trial even if no individual error would be sufficient to require one standing alone. We can best respond by referring to the district court's summary of the evidence and its explanation of why the defendants are not entitled to a new trial:

> In sum, none of the foregoing, either singly or in combination, warrants the conclusion that there is "a serious danger that a miscarriage of justice has occurred...." *[United States v.] Brennan*, 326 F.3d 176, 189 [3d. Cir.200]. The weight of the evidence was not contrary to the verdicts. Three unrelated witnesses, Mr. Naylor, Ms. Donovan, and Ms. Barrell, gave testimony undermining the Learys' alibi and placing one or both of the Learys at the restaurant at the approximate time the fire was set. The alibi the defendants themselves advanced put them together by themselves that night during the time of the fire. Travis, having chosen to testify and put his credibility at issue, admitted to lying under oath on a previous occasion when it suited his purposes. The unrebutted evidence of forgery in the creation of the assignment of the lease for the Yankee also cut against the credibility of Travis's testimony. Evidence that he purchased wicks on the day of the fire was substantively damning, and the reason

he described for doing so was yet another blow to his credibility.[4] The brothers chose to present themselves as united on all significant issues, so that the blows to Travis's credibility and to their joint alibi landed on Paul as well. The only believable motive for the fire belonged to the Learys.[5] The timing of Paul's call to the insurance agent and the subsequent insurance increase were suspicious. Travis's inquiries about fire insurance and fires at the shopping center generally and at the Yankee in particular were odd enough to raise suspicion even before the fire.[6] Travis's statement to the landlord's representative that the building was old, in the context of his questions about fire insurance carried by the landlord and his later insistence that the landlord build a new restaurant on the site for the Yankee, added further weight to the motive evidence against the Learys. Evidence of the problems created by the lack of a liquor license and the advantage of having time to acquire one while not having to sell liquor illegally to make ends meet at the restaurant also weighed against the brothers, as did the evidence that rent increases they could ill afford were locked into the actual lease governing the property. Finally, the only ones with access to the building without having to force entry were the Learys. Lending further weight to that opportunity and identity evidence was the record of a phone call between the brothers at or near the time of the fire, indicating planning and coordination.[7]

378 F.Supp.2d at 500–01 (footnotes in original) (some citations omitted).

## II. CONCLUSION

The district court carefully considered each of the claims of error defendants are now relying upon in their effort to win a new trial. After summarizing the evidence, the court concluded: "In the face of this evidence, and in the absence of any credible alternative evidence or theory to explain the arson, this case does not warrant taking the extraordinary step of setting aside the jury's verdict." 378 F.Supp.2d at 501. Inasmuch as we do not find any error, we agree. We will affirm

4. Travis testified that, to save money on the small candles used at the tables in the Yankee, he bought the wicks, after talking it over with his brother, with the idea that they could reuse the candle wax. He described his money-saving plan thus: "Just stick a screw driver down into it, put the candle wick down into the light [sic] and you got a brand new candle." On cross examination, however, he acknowledged that the votive candles used at the Yankee could be purchased for fifty cents a piece and were listed on the store receipt as being "15 hr." candles. A package of wicks cost two to three dollars.

5. At various stages, the defendants suggested that the Ozdemirs somehow might gain from the fire because they had a claim against the Learys for failing to pay amounts due on the purchase note and wanted to have a pool of cash, i.e., the insurance proceeds, against

which to collect. This argument was speculative at best and distinctly unpersuasive.

6. As previously noted, the landlord's representative was sufficiently taken aback by her conversation with Travis on those topics that she said she'd never had a conversation like it in over thirty years in the business and that she immediately commented on it to her co-workers and made a note of it for her office file.

7. Travis explained a cell phone call he received from Paul shortly after 11:00 p.m. by saying that Paul called him just to give assurance that he'd gotten home safely after the short drive from Travis's house to Paul's. That represents such an extraordinary level of concern and solicitude between the brothers that one may think it unlikely to be true.

the judgment of conviction and the order denying a new trial.