Sharp & Brown *vs.* Loyless.

Sharp & Brown, plaintiffs in error, *vs.* E. B. Loyless, defendant in error.

(McCay, J., having been of counsel below, did not preside in this case.)

1. A motion, made on oath at the first term of the Court, to set aside an award, which did not state that the award was the *result* of accident or mistake, or the fraud of some one or all the arbitrators, or parties, or that it was otherwise illegal, pointing out in what the illegality consisted, was insufficient, and was properly dismissed on demurrer.

2. When such motion was made at the proper term it was amendable at a subsequent term. But if the movant did not ask to amend, and chose to go to trial on the motion as made, the judgment against him, when affirmed by this Court, is final and conclusive, and the matter in controversy is *res adjudicata.*

3. The judgment ordering an award spread upon the minutes will not be set aside, because the presiding Judge was one of the arbitrators, who was to be paid *jointly* by both parties for his services, when the parties made no objection to the Judge presiding, on the ground that he was an arbitrator, till after the case had been brought to the Supreme Court and final judgment rendered. It is too late to raise the objection in a bill of review filed for the purpose of getting a new trial.

4. A bill of review will not be sustained and a new trial granted, on the ground that the parties, dissatisfied with the award, asked the Judge of the Superior Court to keep the Court open, to give them time to perfect their objections to the award, which he refused to do, but adjourned on the morning of the first day of the adjourned term; as the award was entered upon the minutes at the November term, and the Court was adjourned over till March, when the request was made by counsel and denied by the Court. The bill does not show sufficient diligence, or sufficient reason, why the objections to the award were not made out in proper shape between November and March and filed before the Court adjourned; the more especially as the counsel did not, at the trial term, move to amend, but went to trial upon his objections as made out and filed before the adjournment of which he complains.

5. A bill of review will not be sustained, or a new trial granted, on the ground of newly discovered evidence, unless it is shown: 1. That the evidence has come to the knowledge of the party since the trial. 2. That it was not owing to want of diligence that it did not come sooner. 3. That it is so material that it would probably produce a different result if the new trial were granted. 4. That it was not cumulative only, speaking to facts in relation to which there was evidence on the trial. And the affidavit of the witness himself must be produced, or its absence accounted for. 6. The new trial will not be granted if the only object of the testimony is to impeach the character of a witness.

Sharp & Brown *vs.* Loyless.

Bill of review.   Arbitration.   Newly discovered evidence, etc.   Before Judge HARRELL.   Chambers.   Webster county. September, 1869.

Sharp & Brown filed their bill, returnable to the November Term, 1869, of Terrell Superior Court, against Elliott B. Loyless.   In said bill complainants charged as follows: In August, 1863, they purchased of defendant a warehouse and lot and other real estate in the town of Dawson, in said county, and took conveyance for it; possession was to be delivered to them on the first day of January, 1864; at the time of their purchase there was stored in said warehouse between two and three thousand bales of cotton, and by agreement of purchase, defendant was to have the charges for storage on said cotton up to first January, 1864, complainants after.   Complainants were to deliver the cotton on storage at the time of its delivery to them, to the receipts of defendant, collect the storage due thereon and account to defendant for all which accrued up to first January, 1864.   At the time of the trade much of said cotton was in a damaged condition from exposure to the weather; the warehouse was very insecurely inclosed and the cotton exposed to loss from outside depredations.   Defendant was to put the cotton in good condition and make good all losses on it up to time of delivery to complainants.   When complainants took possession, defendant claimed from them a bond with security for a large amount, conditioned to deliver the cotton to its owners, when called for, and to indemnify defendant against his outstanding receipts for the cotton which complainants refused to give, because not a part of their contract of purchase.   They then resisted the giving said bond and now aver such to be the fact.   In consequence of this difficulty complainants employed one of defendant's sons in the warehouse, as clerk, to attend to the business for them, and also to protect the interest of defendant, and kept one of them in their employment the greater part of 1864.   Very little of the cotton was called for or delivered until after the surrender, in the spring of 1865, when, from time to time, to and during the year

1866, it was delivered to its owners as it was called for and claimed.

From the length of time the cotton had been on storage, and from its exposed condition, much of it was in a damaged condition, heads had been torn off, marks obliterated, packages burst open, and the whole was in such a confused condition generally, that identification of particular lots called for by the warehouse receipts was always difficult and in many cases utterly impossible; the bagging and ropes from many of the bales was completely destroyed and gone, and, for preservation, the lint had to be thrown into a room in the warehouse and thence repacked into other bales; many others had to be repacked; from the time delivering of cotton commenced to the end, defendant or one of his two sons were always about Dawson, and in the absence of defendant one of his sons acted for him. When any of the cotton was called for on the receipts of defendant, notice was given of the fact to defendant, if present, if absent, to one of his sons, most generally to his son James, who knew most about the business, and who most generally acted as his father's agent; but both sons acted for him and one or the other either actually superintended the delivery of cotton, or it was done under or by their direction, and in no instance was this departed from, except in some cases when the cotton called for was easily identified; but during the time of the delivery of said cotton from the warehouse, defendant or his sons had uninterrupted, continuous and unrestricted entrance to the warehouse, and the most perfect and absolute control of the shipment and delivery of all cotton in the warehouse, for which the defendant's receipts had been given. Complainants assisted and contributed all in their power to the repacking, identification and delivery of all cotton by themselves and clerks, being largely interested to do so, to get the amount due them for storage, but in any case of doubt or difficulty they, or their employees, acted in the delivery under the direction of defendant. In many cases, when from the damaged condition, destruction or obliteration of the marks, cotton could not be identified by its marks, the missing cotton was made

up or supplied by an equal number of bales from those without marks, or from repacked cotton, by express directions of defendant, and when this character of cotton gave out, the missing cotton was made up from other lots of cotton in the warehouse, which had not been called for, (and this also under direction of defendant,) until all of the cotton in the warehouse was disposed of. When all, or nearly all, had thus been delivered, it was found that there was still outstanding a number of defendant's receipts and no cotton in the warehouse to satisfy them. Among these were receipts for twenty-five bales in the hands of J. F. Simmons, attorney for owner, viz : nineteen bales marked $\underset{A}{C}$, known as the Clements' lot; one bale marked J. W. K.; four marked C. P., and one marked C. W.; the delivery of this cotton being demanded of defendant, and not being in the warehouse he settled the same by paying two thousand dollars in satisfaction therefor. Receipts for eight other bales held by S. R. Weston, as agent for Walden, Eggleston & Co., were presented, and as the cotton was not forthcoming, defendant took them up by the substitution of other cotton in their place (in February and March, 1867,) then worth from twenty-seven to thirty cents per pound.

Complainant Brown then took up receipts for twelve bales held by one Mr. Knowles, and for eight bales held by A. W. Jones, either by giving cotton for them, or money at their full value; he gave Jones six bales and the storage for the receipts he held; the twelve bales of Knowles' cotton was an entire loss to complainant Brown, and of the value of $2,000; the Jones' eight bales he recovered. Besides these receipts, the books of defendant showed outstanding receipts for thirty other bales not taken up, and which, to the day of filing this bill, had not been called for—though a portion had been cancelled by the delivery of the cotton to the owners without taking up the receipts, and complainants charged that such was their belief as to the whole of the thirty bales above mentioned.

Complainants and defendant were at same time at issue as to the amount of storage due to and from each other as col-

lected by them respectively, defendant claiming that complainants had not accounted for all of his storage collected by them, and they contending that they had not only paid him in full for such storage, but that, on the contrary, he, defendant, was due them storage, which he, defendant, had collected for them.

In 1863 or 1864, defendant had sold a lot of fifty-two bales cotton to one Porter Fleming, of Augusta, and gave his warehouse receipts for the whole lot as being in store, when, in fact, the whole was not, and when, in 1864, delivery of said cotton was required by Fleming from defendant, he borrowed, from complainant Brown, five bales cotton to make up the deficiency—these five bales defendant had never returned, but still owed complainant Brown for them.

Defendant claimed they should pay or make good to him what he had paid to Simmons and Weston for the lots of twenty-five and eight bales as above stated; they refused to comply because they had not got the cotton and converted it, nor had it been lost by any act or fault of theirs in any respect, which they again charged to be the fact, but as they and defendant were at issue they mutually agreed to refer the matter in controversy to arbitration, and selected H. K. McCay, Council B. Wootten and the Honorable John T. Clarke, Judge of Superior Courts of that Circuit, as arbitrators.

They were, by agreement, to submit all matters in controversy to the arbitrators, and the submission, as made and signed by the parties, extended to and embraced within it, not only the claims of defendant for the cotton he had paid for and the storage he claimed due him, but, also, the claims of complainants for the cotton they had respectively paid for and the storage they claimed to be due by defendant to them, including the five bales last mentioned. The submission was very general and covering all matter in controversy between the parties. The original submission having been lost or destroyed they could not give a copy thereof.

The arbitrators accepted and opened the trial on the third September, 1867, and, after hearing a part of the testimony, adjourned the further hearing until the 28th November, 1867,

when the regular November term of the Superior Court for the county of Terrell was in session. This time was selected for mutual convenience of the arbitrators and all counsel engaged in the cause. On the day last mentioned, the hearing was resumed, and the evidence taken until the same was closed on both sides, when, after argument had, an award was rendered against complainants in favor of defendant, for the sum of $2,000, paid by him to Simmons, $1,080 paid by him to Weston for eight bales, and he required that complainants should give bond, with security, in the sum of $2,500, to indemnify defendant against the receipts for the thirty bales still outstanding, that complainants should pay C. B. Wooten $350, defendant pay H. K. McCay a like amount, and John T. Clarke to have a like amount, to be equally divided between complainants and defendant, each paying one half thereof, for their services as arbitrators and a small sum to the bailiff, to be divided between and paid by the parties. [A copy of the award is appended to the bill and referred to as an exhibit.] Immediately upon the rendition of the award, the Court being in session, it was entered upon the minutes by order of the Court; agreement having been made before its rendition, and before the evidence closed, between complainants and defendant, that it should be entered at that term, which agreement had been made to avoid all questions as to whether that was the next term of the Court, at which it should be entered, and for no other purpose. Immediately afterward, on the same day, the Court adjourned over to the ...... day of March, 1868, leaving nearly the entire business of the term to be transacted at the adjourned term. Said award so rendered was wholly illegal, because it was the result of the grossest mistake of the facts of said case by said arbitrators, as demonstrated by the whole of the evidence submitted during the hearing, by complainants and defendant, and, in consequence thereof, was unjust, illegal and inequitable; said award was the result of a mistake of the law applicable to said case by the arbitrators, in this: that on the trial of said cause, the said E. B. Loyless, (who was designated as the plaintiff in said cause,) H. Satterfield, Stephen Weston, John

A. Hiers, John Kilpatrick, W. J. Harp, T. W. Loyless, George Bunch and James Bell, were sworn as witnesses and introduced by defendant, as also the evidence of C. H. Rosenburg, G. F. Bell, J. S. Clements, and James A. Jones, taken by commissioners, were read in evidence by him. On the part of complainants, who were denominated defendants, the following named witnesses were sworn, examined and testified, viz.: James T. Sharpe, B. T. Byrd, C. W. Jones, David Sharp, and Leroy Brown, John A. Fulton, C. A. Cheatham, as also the depositions taken by commissioner, of A. L. Stamps, Porter Fleming, J. H. Anderson, John C. Byrd, A. W. Jones, James J. McElrath, Elizabeth Bostwick, Almarine Dillard and Edward Fulton. [Copies of the interrogatories and a brief of the oral evidence of all of above named witnesses attached to bill as exhibits.]

The oral evidence was not full and complete, but was such as was taken down by the arbitrators at the time, and such as was kept by themselves, but nothing was omitted that would have a tendency to criminate them, (complainants,) but much of what said witnesses testified to was omitted, and was not reduced to writing by said arbitrators, through inadvertence on their part or otherwise, and which complainants refer to hereafter. Besides the evidence above referred to, there was put in evidence, and read, a letter from Fleming to E. B. Loyless, and a letter from Robert Muer & Company, not in possession or control of complainants; also, warehouse books of complainants and of defendant, the shipping and receipt books of Southern Express Company, at Dawson, showing the amount of money sent by defendant to Robert Muer & Company, at Charleston; also the shipping book of the Southwestern Railroad Company, at Dawson, an abstract of which is in Exhibit B; various express receipts from the Company to defendant for money remitted to Robert Muer & Company; also, a great number of warehouse receipts given by said defendant for cotton that had been delivered and receipts cancelled, all of which are in the control of defendant, except the warehouse books of complainants, and which cannot be attached as exhibits. They prayed that defendant might

produce them at the hearing; and averred that there was nothing in any of them showing *mala fides* on their part or tending to charge them with any liability whatever to defendant for lost cotton or storage, except some small matter, but which they charge is important to their present complaint and very material to them, as they propose to show hereafter. A careful consideration of the evidence contained in exhibit B will show that all cotton in the warehouse at the time of its delivery to them, was delivered by them to the receipts of defendant; it was not shown by that evidence, or any part of it, or by any other evidence, either directly or indirectly, that the cotton paid for by defendant was used or converted by complainants, or any part thereof; it does not appear by the uncontradicted evidence of James T. Sharp, who was disinterested, that a part of the identical cotton in controversy, viz.: nineteen bales of the twenty-five which defendant paid Simmons for, marked $_A$, and one of same lot marked C. W., was delivered to Stamps & Briggs by the express direction of defendant, and under the immediate control and supervision of his son and paid agent for that purpose, and that defendant received thirty-five cents per pound for it. By the same testimony, (Exhibit B,) it also appeared that defendant sold over five hundred and seventy bales of cotton, in 1865, to Briggs & Company, at least five hundred and forty-three of which were in the warehouse, composed of a great number of small lots of different marks, at thirty-four cents per pound, with one cent per pound additional to put the same in order and to deliver and ship it; that he gave his son, "Pony," or James E., one dollar per bale to represent him and to do this work for him; that in the shipment of this lot, James E. did act as his agent, picked out, selected and shipped it for him; that in so doing, he failed to find the whole of particular lots called for by receipts.

One witness, (A. L. Stamps,) testified that they lacked as much as one hundred bales, and all say there was quite a number short. To supply this deficiency, cotton was taken by defendant's direction, from bales that had no marks, and from others whose marks corresponded most nearly with

those called for by the receipts, and from other lots without regard to marks, and thirty or forty bales from cotton known as Jerry Beall's. (Reference made to testimony of James T. Sharp, N. L. Stamps, James J. McElrath, and others.) It further appeared from Stamps and Edward Fulton's evidence, that defendant received for this entire lot of cotton $102,985 95, and by defendant's evidence, that it belonged to Robert Muer & Company, of Charleston, South Carolina; and by defendant, the receipts he exhibited, express receipts and shipping book in evidence, and not exhibited hereto, that defendant only accounted to Muer & Company for about the sum of $85,000, leaving a balance in his hands of about $18,000, of which he was entitled to $3,028 17 for repacking, shipment and delivery, as per agreement with Briggs, of one cent per pound, and leaving still a balance of $15,000 in his hands, $5,000 of which covered warehouse expenses. They charge that this lot was the earliest lot of cotton shipped after the surrender, and that from the irregularities, not to say improprieties of a most extraordinary character, in making up, delivery and shipment of this lot, by defendant or his agent, grew all the subsequent losses and confusion. They charged, that it further appeared by the evidence of Leroy Brown, that in 1864 he let defendant have five bales of his own cotton to make up the lot sold Porter Fleming ; that this was partly and sufficiently corroborated by the evidence of John A. Bishop, to have required the arbitrators to award in Brown's favor for the same, but they did not, although it was not denied by defendant or any other witness. Defendant said he did not recollect it, though he did not deny it.

On these several specifications, and the evidence in support of them, the award should have been made in favor of complainants, as to the five bales of cotton, and against defendant as to the twenty-five bales controlled by Simmons, and as to the eight bales controlled by Weston, and hence, said award as rendered, was the result of a mistake of the facts by said arbitrators, and illegal.

It was the duty of defendant, when he turned over to them the possession of the warehouse, to have furnished a descrip-

tive list of all cottons in store for which his receipts were out, that they might have compared said list with the cotton in store, and verified its correctness; they admitted that, as prudent men, they ought to have required this to be done before going into possession, or to have caused said list to be made out themselves, but said that at or about the time they took possession, complainant Brown, the active member of the firm, and the only one present, was sick, and could not give it his attention, and when he got well, matters had progressed so far that such a step would have been of little benefit, and, besides, the war was then at its height, and everything in so much confusion as to render it extremely difficult to transact any kind of private business with accuracy, and consequently it was never done. Complainants admitted that if they had had uninterrupted control and management of the warehouse, and all cotton therein, from the time they took possession until it was shipped out, that the *onus* would have been on them to account for cotton lost or missing from the warehouse, whether called for by their own receipts or the receipts of defendant, and that they would have been *presumptively* liable for all such cotton as was not affirmatively shown to have been converted by defendant; but as no such exclusive control of the cotton in said warehouse, for which defendant's receipts were out, was ever had by them, and as defendant continued, by himself and his agents, to exercise a personal control over all such cotton, to direct and superintend the delivery and shipment thereof, to enter the warehouse, take such and any cotton he chose, and at his pleasure, defendant thereby destroyed and defeated the integrity of the contract, and no such *onus* was cast upon complainants, or presumptive liability arose against them in favor of said defendant for any lost or missing cotton that he had accounted for; and that, before defendant, in law or equity, under the facts of this case, could call upon the complainants to account, he must make it *affirmatively* appear that such cotton had either been received or converted by complainants or their employees, or that it was lost or destroyed by the gross carelessness or neglect of complainants.

Nothing of that sort was made to appear on the trial of said submission by any evidence direct or indirect, and herein complainants charged that said award was the result of a mistake in the law by said arbitrators, and illegal.

Complainants further charged, that upon the trial said arbitrators were unjustly and improperly prejudiced against them by the illegal evidence of one H. Satterfield, who tes-' tified before them that complainant Brown had ordered him to turn out seven bales of Jerry Beall's cotton, and change the marks from diamond J to diamond B, and deliver receipts for it to complainant Sharpe, who shipped the same to Macon, to J. H. Anderson & Son; that he had seen him (Brown) rubbing dirt on a bale of cotton belonging to Rosenburg, as if to obliterate the mark; that there was no other lot of cotton in the warehouse marked diamond J but that of Jerry Beall. This whole evidence was illegal, because not pertinent to any issue before the arbitrators, and ought not to have influenced them as it did, because it was untrue, as shown by the other evidence, as no such lot of cotton was shipped to J. H. Anderson & Son; the lot shipped to them being in a different mark, and one that belonged to Brown, as shown by the witness, Fulton. The lot of cotton marked diamond J, about which Satterfield testified, was a part of a lot which had belonged to Adam S. Jones in that mark, and which Brown had gotten from him, as shown by the evidence of Brown, and confirmed by that of Jones; nor was there anything in the evidence as to the Rosenberg bale of cotton, as explained by Brown and confirmed by Rosenburg.

Complainants further charged, that at the time to which the November Term of said Court, 1867, had been adjourned his Honor, John T. Clarke, presiding as Judge of said Court, appeared and opened the Court about twelve o'clock of that day, and complainants knowing that the whole, or nearly the whole, of the business of the term was to be transacted, and that it could not be got through with in a week, there being business enough on hand and ready for trial to have occupied the Court at least two weeks, and complainants and their counsel having every reason to believe that the

business of said Court would go on and be transacted according to its order, and complainant's counsel relying on that order, as they were justified in doing, believed they had ample time in which to make their objections to said award in terms of the law, and which they could not have done earlier, because of the necessity for complainants and all their counsel to be together when said exceptions to said award were made out. At the moment when Court opened, complainants and their counsel were together, and actively engaged in preparing and putting in writing the suggestions of error to said award; and hearing the announcement of the opening of Court, all hurried to the Court-house, and found John T. Clarke, the Judge thereof, and one of said arbitrators, in the act of adjourning that term over to the next regular term. Complainant's counsel had prepared a part of their exceptions, but they were unfinished, and the most important parts and necessary statements required by statute had not been embraced therein; counsel at once appealed to the Court to give them time to finish their suggestions of error and exception to said award. The Judge exhibited great impatience, and refused at first to delay the adjournment one moment, but finally consented to wait five minutes, and in that short time counsel was compelled to bring their suggestions to a close; the Judge all the time standing on the steps and ordering the sheriff as many as three different times to adjourn the Court, and finally gave the order so peremptorily that no longer delay could be made. From the hurry, confusion and excitement necessarily growing out of such a state of things, it was impossible for complainant's counsel to frame their suggestions of error with that technical accuracy and precision required by the Courts. (A copy of which was attached to the bill with prayer for usual reference.) Indeed, under the rules required by the Court, and within the time allowed by the Court, it would have been impossible to have referred to the evidence heard by the arbitrators, and to have incorporated therein all that was necessary to make the suggestions sufficient to authorize an issue to be made up and tried by a jury. Consequently, at

a subsequent term of the Court, upon demurrer, they were overruled, and the judgment overruling them was affirmed by this Court at the last term. See *ante*, page 8.

Under the circumstances attending the holding and adjournment of the Court by a Judge who acted as one of the arbitrators, and who was interested in his own award to the amount of $350 00, without even the organization of a jury to try said issue, had one been made up, said term being not held, the effect of the whole matter operated as a fraud upon them, and to the prejudice of their rights.

Complainants further charged, that since the rendition of said award, they had learned, from indubitable information, that a receipt for ten bales of cotton, viz: eight marked W and two marked M. H., for which they were required to give a bond to indemnify defendant by said arbitrators, were in the hands of P. L. Welborn and M. Helton, to whom the cotton belonged; that the ten bales had been turned out to them, and by them sold long before the warehouse came into the hands of complainants; and they charged the same to be true of all other cottons for which they were required by said award to give bond. Complainants then put in a plea under the Relief Law and Ordinance of 1865, by showing that the sum given against them by said award grew out of, and was dependent upon, a contract entered into in 1863, and that if said sum remained as a charge against them, notwithstanding the matters set up in said bill to the contrary, and while they did not admit it to be a just and equitable award, yet, if not overturned, they claimed that they were entitled to the benefits of that law, by showing the amounts and value of the property owned by each, and upon the faith of which they contracted, and their subsequent and respective losses by the result of the war, setting out said facts specifically in the bill. The bill further charged the issuing of an execution against them to enforce said award, which they prayed might be enjoined.

The prayer of the bill was, that said award might be set aside and a new trial granted, and that upon the hearing thereof all the rights and equities of the parties might be

settled and determined as if no such award had been made and for general relief.

Judge Harrell being out of his circuit, the bill was presented to Judge Clark, of the South-Western Circuit, who granted the injunction against the *fi. fa.*, as prayed for. The defendant was served, and on the 11th September he answered, having previously moved to dissolve said injunction and dismiss complainants' bill on the coming in of the answer.

The answer of defendant first showed and set up, by way of demurrer, that there was no equity in the bill, and that it ought to be dismissed, because all the matters therein were, as between the parties, *res adjudicata*, having been submitted to arbitration, and an award, rendered by the arbitrators—judgment in the Court below and an affirmance by this Court—and that all the matters in said bill were heard and determined, or might have been heard and determined, as they were in existence at the time. And, by way of answer, defendant admitted the main facts charged, as to the trade made by him with the complainants, as to amount of cotton in store, and the delivery of warehouse to complainants in January, 1864, and said that it was a part of the contract, that complainants were to execute and deliver to him a bond of $100,000 00 for the faithful performance of said agreement on their part. He denied that much of the cotton was damaged at the time complainants took possession of the warehouse; only ten or fifteen bales were damaged that could be ascertained by examination; that complainants refused to receive the cotton unless in good order, and that he, at great expense and trouble, put the same in good order, and satisfactory to complainants. He admitted that he claimed the execution of a bond as charged, and charges that complainants agreed to give it, and under their promise to give the bond, he permitted them to take possession. Afterwards they refused to give the bond as promised. He admitted that complainants hired his son in their warehouse, but does not know for what purposes, except that they wanted him on account of his familiarity with the business and location and arrangement of the various lots of cotton. He admitted that

most of the cotton remained in the warehouse, and was delivered in 1865–'66, but denied that complainants delivered all the cotton upon presentation of his receipts, as he had to pay Simmons & Weston $3,080 00 for cotton in store, when they received possession from him, but was not there, or missing when called for by the owners. He admitted that heads were out and ropes off a great deal of cotton, and that some of it could not be identified, and some of it had to be repacked, but denied that he was there at every delivery of cotton, or that complainants sent him word whenever a delivery was necessary, as he resided in Hardmoney, Webster county, during the years 1865 and 1866; and further denied, that James E. Loyless was his agent, but presumes he had defendant's interest in view, as any son would. Defendant requested his son to assist complainants in turning out the cotton whenever called upon, or it was necessary, but he emphatically denied that either he or his sons had any notice of the delivery of the cotton for which complainants were held liable in said case, nor did he know that the same had been delivered, nor but that it was in the warehouse, until his receipts were presented by the owners, and payment demanded. He admitted that he frequently visited the warehouse, but denied that he had any control over, or management or delivery, or shipment of said cotton, but always regarded complainants as the custodians of said cotton, and consequently permitted them to manage and deliver all of said cotton. He admitted that he suggested to complainants that whenever there was missing cotton to make it up out of unmarked lots, and at all times to compare bagging and rope and try to fill the lot out of bales which were unmarked, and nearly resembling the size, bagging, etc., of the bales known, but says that he gave complainants positive orders not to make up any lot out of marked cotton, and in no instance thus to make up a deficient lot in that way.

In reference to the Simmons lot—twenty-five bales—defendant admitted there was not cotton to fill the demand, but the twelve bales of Knowles' cotton, for the reason that complainants had made way with it; he further said, complain-

ants suggested to defendant the taking of eight bales of Knowles' cotton to pay Weston, but he refused, as he and complainants both knew it was Knowles' cotton.   He admitted the payment to Weston of eight bales of his individual cotton, which, with amount paid to Simmons and the charges amounted to $3,080 00, and that said cottons had been abstracted  and made away with by complainants; that complainants were held liable by the arbitrators for this amount, and defendant insisted they are liable for it still. He knew nothing about how much money complainants may have paid for cotton taken or shipped out by them ; knows they never paid for any taken out by defendant.   He admitted that he sold a lot of cotton to Fleming which was not in the warehouse, and gave his warehouse receipts; stated to Fleming, at the time, that the cotton was not in the warehouse, but that it was under a gin-house, and that he would put it at the depot upon notice; did this that Fleming might negotiate the receipts, if necessary ; afterward delivered from cotton not in the warehouse, and which had never been in it, in response to his receipts, and denied that he borrowed from complainant Brown, or out of complainant's warehouse, for that purpose.   He admitted that these issuable matters, and all other matters connected with said transaction, were submitted to arbitrators, and that an award was made as set out in exhibit to said bill, and that soon after said award was made, arbitrators and counsel repaired to the Court-house ; that the Superior Court was then in session ; that the same was put upon the minutes without objection on the part of complainants ; denied that that agreement referred to in said bill was made for the purpose as therein charged, but because of the stipulation in the agreement to refer; that the award should be final and conclusive upon the parties; admitted the adjournment of the Court as charged; denied that the award was the result of a mistake of law or of facts by said arbitrators.   He admitted that the persons named in said bill were sworn as witnesses, and the documentary and interrogatory evidence, as charged, to be truly stated; denied that it did not appear in evidence that there was a claim for lost cot-

ton, storage, etc.; said the arbitrators set off the damaged cotton in the warehouse against his claim upon claimants for storage; that the testimony of Sharp as to the nineteen bales was overcome by other testimony on the trial, and denied that any of said cotton went into the Briggs lot. He admitted that he sold a large lot of cotton to Briggs for Muer & Co., of Charleston, to whom it belonged, and that it was delivered from the warehouse, but denied that any marked cotton of others was put in this lot of cotton, and that Briggs got any more cotton than he really purchased; but, on the contrary, failed to get quite as much as he purchased. Admitted that he made money by commissions and some storage on the cotton of Muer & Co., sold to Stamps. He denied, and still denies, that complainant Brown loaned him any cotton; denies that it was his duty to make out an inventory of the cotton in the warehouse at time of delivery; charges that complainants examined everything, and went into possession after said examination.

Further answering says, the award was returned into Court at November Term, 1867; counsel for complainants had an abundance of time from then to the sitting of the adjourned term to make out and file exceptions, as in contemplation of law, said Court was open all the time until March, the time of the sitting of said adjourned term. He then refers to his demurrer to exceptions, and its being sustained by the Court, and the judgment of this Court in affirmance, and pleads that complainants are concluded by said judgment. Denied that John T. Clarke, Judge, fraudulently adjourned the Court, or that the complainants did not have ample time to file exceptions. He did not know whether the arbitrators were prejudiced or not, but knows their prejudice was not manifested in their award on account of the evidence of Satterfield and Rosenburg; knows nothing about the new matter set up, but if it is true, does not ask indemnification by bond as to the Welborn or Copeland cotton. He denied that the Ordinance of 1865, or Relief Law of 1868, have any application to this case.

On the 16th September, the complainants filed in office an

amendment to their bill, in which they gave notice to the defendant that on hearing of the motion to dissolve the injunction and dismiss the bill, they would insist upon the following amendment, viz:

That in the year 1864, defendant sold to one Porter Fleming, of Augusta, fifty-two bales of cotton, and issued to him his warehouse receipts for said cotton as then in said warehouse in Dawson, and then and there received full payment for said fifty-two bales, when, at the time, he did not have a single bale of cotton in said warehouse belonging to himself, nor as many bales anywhere else. On the contrary, he only had twenty-five or twenty-six bales of his own cotton, which were at the time under the gin-house of one Bush, in Webster county; the balance of cotton to make up said number, he depended upon buying up when it should be called for by Fleming—that afterwards, when said Fleming did call for the delivery of said cotton, according to his said receipts, he had not succeeded in securing enough for that purpose by about thirty bales, and to make up the deficiency, said defendant borrowed the five bales from Brown, already referred to in complainants' original bill, and took twenty-five bales of cotton out of the warehouse, which were on storage, belonging, as complainants now believe, to one James Warren; at any rate, it was not the cotton of defendant, and was used by him, as complainants believe, without any authority; and when this cotton, so turned out to Fleming, was called for, it was supplied by other cotton in the yard, but to whom it belonged, or what were its marks, complainants do not know, as defendant made the arrangement, took the cotton and delivered it in satisfaction of his receipts, as he was constantly in the habit of doing, either by himself or his sons, from the time of complainants' purchase and possession of warehouse until all the cotton therein was taken out and delivered. Complainants say that, as to the want of authority and right of defendant to take and appropriate the cotton of said Warren—if it was his—and of the taking of other cotton out of the warehouse equally not his own, and with no right to use said cotton for that purpose, to replace said cot-

ton of Warren, supposed to be so taken and appropriated by him, it was not put in evidence before the arbitrators on the hearing, because the same was then unknown to complainants; and further, that the putting said award on the minutes of the Court at the November Term, 1867, was illegal and void, because the Judge of said Court was interested in said award to the amount allowed him therein for his services as one of the arbitrators, and he could not, on account of such interest, preside at that time and for that purpose in said Court as Judge.

This amendment was answered by defendant on the 18th September, 1869, as follows, viz.: He denied that he took from the warehouse any cotton belonging to Warren or any other person to pay Fleming, but said that he had in said warehouse of his own cotton, forty bales, for which he had the receipts, and was moved out by complainants, or their agents, to John A. Bishop's, the following cottons, viz: Four bales marked C S; six bales marked L K; two marked W Y; three marked F M G; two Q | S with a strike between; two W D C, and two L M; one J P, making twenty-two bales. At another and different time they turned out to said Fleming three bales marked J A B; one bale marked X B X, and the balance of the sale at that time to Fleming was the Bush cotton, twenty-one bales, and said bales of cotton except the twenty-one bales of the Bush cotton was the property of defendant and in the warehouse, and they turned it out on the receipts; and perhaps complainants may have loaned defendant three bales, not being able to find so much of defendant's cotton, and defendant denied that he ever turned out or got a single bale of the cotton to his own use, except what belonged to him, as herein stated. Defendant had other cotton out of the warehouse besides the Bush cotton. He averred that Judge Clarke declined to allow the award to go on the minutes unless it was consented to because of his being an arbitrator, but counsel stated that they made no point on his being one.

The motion to dissolve the injunction and dismiss the bill came on on to be heard upon the bill, amended bill, answers and amendment thereto, and upon certain affidavits, and after

argument thereon the Chancellor dissolved the injunction and dismissed the bill for want of equity, and complainants, by their counsel, then and there excepted.

Said affidavits were as follows :

Complainants read an affidavit of RICHARD LYON, stating, that he and L. C. Hoyle were the only counsel of Sharp & Brown in the arbitration of the matters of controversy between them and E. B. Loyless, submitted to and arbitrated before H. K. McCay, C. B. Wootten, J. T. Clarke in the hearing before said arbitrators, in which they rendered an award, which was returned by them to the Superior Court of Terrell county, and entered on the minutes of said Court for the year 1867. And upon deponent devolved the duty of preparing the suggestions of error in said award, by said arbitration, and preparing the grounds and specifications of such error, by arrangement between himself, his associate counsel and his clients. That when the award was rendered and made, which occurred during the term of the Court as above stated, very little of the regular business of the term had been transacted, and it had already been determined to adjourn over to a future day, when the business of the term could be transacted as had been announced by the presiding Judge of said Court; and that, very soon after, said award was rendered and an order taken to enter it on the minutes of said Court. Deponent thinks the same day said Court did adjourn over, and, as he thinks, to the first Monday in March next thereafter. It was the intention and expectation of deponent, who was residing in Macon, having his office there, to prepare said exceptions, and, for this purpose, he immediately sent down, he does not recollect, whether to the Clerk or his associate counsel, but he thinks to his associate counsel, to have a copy of the evidence prepared and sent to him to enable him to prepare these exceptions and specifications of error from the evidence itself. When the copy came to him, it contained only a copy of the oral testimony had and heard before the arbitrators, as taken down by said arbitrators, and none of the evidence taken by interrogatories, none of the documentary evidence, receipts or books used as evidence on the hearing

of said arbitration. And the business of deponent, his en-
gagements in the Courts during the interval between the ad-
journment of the Court and the time appointed for its meet-
ing at the adjourned term, prevented deponent from going
down to Dawson and collecting, or endeavoring to collect to-
gether, all the evidence had on said hearing, then making out
these exceptions and specifications of error accurately and
technically by the evidence; and as deponent was obliged,
in performance of his obligation to his clients, to attend at
that term, and believed that the Court would in fact be held,
and the business of the Court be transacted by the Judge of
said Court, and that he would, during the session of that
term, have full and ample time to get together all the evi-
dence and prepare the exceptions and grounds or specifica-
tions of error in and to said award, and resting on that be-
lief, he delayed the preparation until that time. Deponent
further states, that he did attend personally at that time, when
said adjourned Court was to be held, and that in the morning
of the day to which said Court adjourned, he met with his
associate counsel and his clients, had commenced the prepara-
tion of suggestions of error and exceptions to said award,
and the grounds or specifications of errors to said award, and
that while so engaged in the office of his associate, hearing
calling going on at the Court-house, he supposed the Court
open and going on; he picked up the papers and specifica-
tions he had already prepared, and which he did not read to
see if they did embrace the specifications of error intended to
be made upon the evidence, or the mistakes of law and of
facts made by the arbitrators, on the merits of the main ques-
tion. When deponent got into the Court-house, he found the
Judge in the act of adjournment. Deponent addressing the
Court stated, that he had not, up to that time, prepared hi
exceptions to the award as was intended by his clients, that it
was necessary to make and file them during that term, and
asked that the Court should not be adjourned until he could
prepare them. The Judge, Honorable John T. Clarke, pre-
siding, said sufficient time had elapsed from the rendition of
the award up to that time to have had them prepared before

Sharp & Brown *vs.* Loyless.

then, and that he would not wait any longer, and ordered the sheriff to adjourn the Court. Deponent pressed the Court for the time, and as the sheriff did not announce the adjournment, he commenced in a hurried and confused manner to put down the grounds of objection as he had them in his mind, without regard to form or technicality. The Judge, in a few minutes, again ordered the sheriff to adjourn the Court, and deponent again protested. The sheriff again hesitated, and while so hesitating deponent hurriedly brought his exceptions to a close in a most confused and imperfect manner. The Court again gave a peremptory order which the sheriff obeyed, and while announcing such adjournment Sharp & Brown were in the act of being sworn to the exceptions before the Clerk, which, when done, was filed, whilst the Judge was making his way out of the house; but for the haste of the Judge in the adjournment of the Court, the exceptions would have been put in better state, more specific as to the errors of law and fact, though deponent was of opinion afterwards that they were sufficient, and went to trial on the demurrer in that belief. [To this was added affidavits of Mr. Hoyle, and of the Clerk and sheriff, showing that said adjournment was hurriedly made.]

L. C. HOYLE, on oath, said: "That when his associate counsel, R. F. Lyon, wrote him for a copy of the evidence in the matter of E. B. Loyless vs. Sharp & Brown, after the award of the arbitrators had been returned into Court, he proceeded to hunt up the papers, and found them in the office of C. B. Wootten, Esq., who was one of the arbitrators in said case, and handed to affiant the papers all in a bundle together, saying that the bundle contained all the papers of the case left in his hands. The books and receipts introduced by Loyless were not to be found with said papers; affiant states that he thinks he made inquiry of the Clerk of the Superior Court for said receipts, as well as of C. B. Wootten ; not finding them, he copied only such evidence (and the record of the case) as the arbitrators reduced to writing themselves, and forwarded the same to his associate counsel, Judge Lyon."

JOHN T. CLARKE, late Judge of the Pataula Circuit, of this, on oath, made the following statement for use as evidence: "In the case in equity in Terrell Superior Court, in favor of Sharp & Brown vs. E. B. Loyless, to-wit: As an arbitrator of the matter in controversy named in complainants' bill, deponent was influenced solely by the desire to do justice, and is satisfied that the other arbitrators were conscientious and impartial. As to the pretense in said bill, that the counsel of complainants were prevented by the impatience of the Judge, and his hurried and arbitrary and corrupt adjournment of the term, when only objection to the award could be filed, from filing such objections with legal sufficiency, deponent says that the charge is utterly untrue. He says that the adjourned term of the Court specified in the bill was adjourned in response to the general desire of the bar and the jurors, because many of the bar being absent, it was generally believed that no such business could be transacted as would justify the further expense and trouble of this extra session. Deponent denies that he felt or displayed any prejudice, passion or impatience about the matter, and denies that complainants' counsel claimed time to file specifications against the award, and was denied competent time, and compelled to trust to insufficient pleading; on the contrary, he states that the adjournment was made in the public interest, and with the usual deliberation and order, and, so far as deponent remembers, without even a request for time to file specifications. Deponent never knew in what style counsel had filed his objections, and was never informed by counsel that he did not have them filed and expressed in the manner preferred by himself. Had the counsel stated to the Court that he had not made satisfactory pleading, and that good grounds existed why he could not have done so before, and requested the Court to be kept open for his benefit, deponent says it would have been the pleasure, as well as the duty, of the Judge to grant the request. Deponent is satisfied that, had the Judge made any impatient and arbitrary refusal to give needful time due by law to counsel to put in his pleadings, that decision would have been, as undoubtedly it

should have been excepted to, and reviewed by the Supreme Court. He is satisfied, furthermore, that the counsel, with all the time intervening the November adjournment and the adjourned term, which occurred, as he thinks, in March, selected deliberately his own mode of attacking the award."

Before going into the argument upon the merits of the motion, and before announcing themselves ready for the hearing, complainants moved to continue the motion, for the purpose of procuring the affidavit of James Warren, and to sustain the allegation in the amended bill as to the taking and appropriation of the twenty-five bales of the Warren cotton by Loyless to his own use, without any authority to do so; the complainants asking only a short time to get the affidavits as they had not time within which to get them after notice to them to dissolve the injunction, the said James Warren being absent from his residence, in the county of Calhoun, for the summer; and also to file affidavits of third parties and disinterested persons to support the allegation in the original bill as to Loyless' control of the warehouse, and delivery of the cotton therein at his pleasure, of all cotton that was in the warehouse from the time complainants received it of him; complainants proposing to support this allegation, and to establish this fact by any number of disinterested witnesses, if a short time was allowed them by the Judge for that purpose, they not having had sufficient time within which to get up and prepare the affidavits. The Court overruled the motion to postpone the hearing, and ordered the argument to proceed. After argument had, the said presiding Judge, by his decision, order and judgment, then and there dismissed the bill for want of equity, and dissolved the injunction; to which said decision, order and judgment, as well also to the decision overruling the motion of complainants to continue said motion, complainants excepted. Loyless' counsel moved here to dismiss the bill of exceptions, because it was already disposed of by the former decision, but theCourt overruled the motion, and ordered the argument to proceed.

L. HOYLE, LYON, DEGRAFFENREID & IRVIN, for plaintiffs in error, submitted the following points on the assignments of error in this case:

1. Court will entertain jurisdiction of bills to review an award, although made the judgment of the Court under the statute, when the mistake or error complained of is admitted or clearly shown. *Childers vs. West,* decided at last term of this Court, head notes, page 51. 2 *Story's Equity,* sections 1450, 1456; 2 *Ves.,* 451, and notes.

2. This was a motion to dismiss bill for want of equity, which admits the facts, and the decision is made on that motion only.

3. It is true there was an answer in, but it did not answer the bill nor deny the facts charged in a single important particular.

4. Or when the answer is in conflict with the bill, the evidence had before the arbitrators exhibited to the bill, sustains bill, and is in direct conflict with the answer.

5. The newly discovered fact is an equity, that if true, breaks down the whole theory of defendant's claim, independently of the mistake of law and of fact by the arbitrator.

It is true that the answer to amended bill denies this equity, but the answer to original bill, on this point, is directly the reverse, and states most positively *that none of the cotton to satisfy the Fleming receipts for fifty-two bales, was taken from the warehouse,* or ever was in the warehouse; and this accounts for lost or missing twenty-five bales cotton.

6. Where it is ascertained that the award is erroneous, it is obliged to be corrected, for it lacks the judicial sanction of the courts of law to make it conclusive, whether right or wrong.

7. The judgment on which defendant relies, viz: the putting this award on the minutes of Court is absolutely void, because the Judge who presided in that proceeding was interested directly. *Code,* sec. 240.

8. The liability in this case having grown out of a contract made in 1863, was within the Ordinance of 1865, and the

defendant having contributed to the loss, it was within the provisions of the Relief Law of 1868, and the injunction should have been retained until these equities were settled.

9. When the answer of a defendant is contradictory or evasive, upon a material point or charge made by the bill, upon which its main equity is based, upon a motion to dissolve injunction upon coming in of such answer, a Court of Equity will hold up the injunction, and retain the bill, until such conflicting statements in the answer are shown to be the result of mistake or inadvertence, and not a wilful perversion of the truth.

10. It is unquestionably true that when Sharp & Brown took possession of this warehouse, and the cotton therein, they assumed all the liability to the owners for its safe keeping and delivery when called for, that was upon Loyless previous to the sale, and that in a contest between such owners and Sharp & Brown, the *onus* would be upon them to show that such cotton had been lost without fault on their part.

11. And so it would have been in a contest between complainants and defendant, if the complainant's control had been exclusive, and defendant had not at any time interfered with their possession, and had no hand or voice in the delivery of the cotton; but—

12. When the evidence in the case shows that Loyless united with complainants in the delivery of the cotton, directed, superintended and controlled the delivery in all doubtful cases of ownership or identity, before Loyless can compel complainants to account to him for lost or missing cotton, the *onus* is on him to show affirmatively that complainant converted the cotton, or that it was lost by their fault alone; and more especially, when it is shown by both parties that no inventory or list of the cotton was made, and all the facts and circumstances establish beyond controversy that complainants contracted with defendant, upon the faith of his representations alone, that all cotton for which defendant's receipts were out, was in the warehouse at the time of its delivery to them.

13. The evidence in the case shows affirmatively that de-

fendant himself sold and received pay for nineteen bales of the cotton, and that, in all probability, he got the whole of the missing cotton.

W. A. HAWKINS, for defendant in error, cited this case: 39th Georgia, 8, and said it was *res adjudicata*.

BROWN, C. J.

1. We have reviewed the decision of this case made by this Court at the last term, and are well satisfied of its correctness. (*Ante, page* 8.) The objections filed under oath at the first term of the Court to an award returned and entered upon the minutes, must show that the award is the *result* of accident or mistake, or of the fraud of some one, or all of the arbitrators, or the parties, or is otherwise illegal, and it must show how, or in what the illegality consists, or it is insufficient, and may be dismissed on demurrer, and the award ordered to stand as the judgment of the Court.

2. When such objections have been pleaded under oath at the first term of the Court, if it should appear at a subsequent term that they are insufficient, or imperfect, the party filing them may, upon application to the Court, amend them, so as to supply the deficiency. But if he is satisfied with the objections, as filed at the first term, and makes no application to amend, but chooses to go to trial upon them as originally made out, and they are held insufficient, or dismissed on demurrer in the Court below, and that judgment is affirmed in this Court, the matter in dispute is *res adjudicata* and the judgment is conclusive.

3. One of the grounds taken in this bill of review is, that the Honorable John T. Clarke, who acted as one of the arbitrators, was the Judge of the Superior Court, who presided at the term of the Court when the award was entered upon the minutes of the Court ; and it is objected that he was interested, as the award directed that he receive the sum of three hundred and fifty dollars for his services as arbitrator, to be paid jointly by both parties to the submission. As the payment was to be made by both parties to the litigation

*jointly*, the interest of Judge Clarke as between the parties is not very apparent. If he was pecuniarily interested in the event of the suit, the Code says he cannot sit "without the consent of all the parties in interest." Was such consent given? His interest is distinctly charged in the bill, and the answer distinctly states, that all parties consented, that no objection was made. And this is corroborated by the fact that no such ground of objection appears upon the record, as having been made at the first term of the Court, or at any time till after the case had been heard in the Court below and had been brought here by bill of exceptions and the judgment of the Court have been below affirmed in this Court, when for the first time it is made in the bill of review as a ground for new trial. We hold under this state of facts that the objection was waived on the trial, and that it cannot now be made.

4. The award of the arbitrators was returned to the Court at the November Term, 1867, and entered upon the minutes, and the Court adjourned till March, 1868. When the Court met in March, it was thought best by the Judge, on the first day of the adjourned term, to adjourn the Court till the next regular term, without transacting any business of much consequence. About the time the Judge had ordered the sheriff to adjourn the Court, Sharp and Brown appeared in Court, by their counsel, and asked that the Court would continue in session till they could have time to put their objections to the award in proper form and file them. The Judge gave a few minutes only, holding that they had already had sufficient time, and he ordered the Court adjourned. About the moment of the adjournment the objections, with which the complainants seem to have been satisfied, as they never made any motion to amend them, were filed. Indeed, we are told in the argument of this case, that the counsel considered them sufficient and went to trial upon them. The refusal of the Judge to keep the Court open and give the counsel further time to perfect his objections, is urged by the bill of review as a ground for a new trial in this case and several affidavits are filed giving reasons why the objections had not been put

in proper shape, during the time that intervened between the November term of the Court and the March adjourned term. One principal reason is that the papers and books necessary to enable counsel to prepare the objections, were not in their possession, but were partly in the possession of the other party, and partly in the possession of certain corporate companies. But is this a sufficient excuse ? We think not. If the counsel had applied to the Judge in Chambers between the regular and the adjourned term, it would have been his duty to have passed an order, requiring the other party or the said corporate companies, to allow the counsel to have access to the books and papers, for the purpose of making up his objections, and if the order had been disobeyed, the Judge would have compelled obedience to it, or he would then have given more time to perfect the objections. The record does not show that the counsel ever applied to the opposite party to allow him to inspect the papers, or to the corporations for the use of their books, or took any steps whatever to get access to the papers. Taking into consideration the time between the regular and the adjourned terms of the Court, and the right to demand the use of the papers for the desired object, we cannot say that there was such diligence as entitles the complainants on this ground, to the interposition of the Court by bill of review after a final judgment.

5. The only remaining ground relied upon in the bill, which has any plausibility to sustain it is, the point made on the newly discovered evidence. To entitle a party to a new trial on the ground of newly discovered evidence, he must show—1. That the evidence has come to his knowledge since the trial. 2. That it is not owing to any want of diligence on his part that it did not come to his knowledge sooner. 3. That it is so material that it would probably produce a different result if the new trial should be granted. 4. That it is not cumulative only—that is, it must relate to facts of which there was no evidence on the trial complained of. The affidavit of the witness himself must be produced or its absence accounted for. And new trial will not be granted if the only

Sharp & Brown *vs.* Loyless.

object of the evidence is to impeach the character of a witness. *Berry vs. The State*, 10 *Ga.*, 511.

Now we do not think the case made by this bill comes up to this rule. It is not shown that these complainants used any diligence to discover the evidence upon which they now seek the new trial. Nor are we satisfied that it is so material as to change the result, if the new trial should be allowed. It is very nearly, if not entirely, sworn off by the answer, and, if it is not cumulative only, it would hardly have produced a different result, if it had been with the defendant's answer before the arbitrators at the time the award was made. But a still stronger objection to it is, that no affidavits of the witnesses themselves are attached to the bill. The amendment was filed after the motion to dissolve the injunction had been made, and time was then asked, to get up affidavits to sustain it on the ground that the witness was not at home. But this was no compliance with the rule. The affidavits of the witnesses, stating what they would testify about the cotton, should have been attached to the bill or their absence should have been more satisfactorily accounted for. The amended answer did not state where the witness, Warren, was, only that he was spending the summer from home. It is not shown that he was beyond the reach of the complainants, or that any effort had been made by them to get his affidavit, before the amended bill was filed; nor is it stated how long since the facts alleged in the amended bill came to the knowledge of the complainants or their counsel. Indeed no excuse is pretended to be given why the affidavits of the witnesses, Wilburn and Weston, are not attached to the bill.

We are satisfied that the complainants are not entitled to a new hearing upon the grounds made by this bill, and that the subject matter in controversy in this case has been finally adjudicated. It is an established rule that a bill of review will not be sustained, when it does not make a case, which requires a reversal of the former decree, or would authorize a new trial. 30 *Georgia*, 826. This bill, whether technically a bill of review or a bill for a new trial, does neither.

Judgment affirmed.