BLANK, Administratrix, Appellant, vs. NATIONAL CASUALTY
COMPANY, Respondent.

*June 3—June 20, 1952.*

*J. E. O'Brien* of Fond du Lac, for the appellant.
*John P. McGalloway* of Fond du Lac, for the respondent.

FRITZ, C. J.  The policy upon which plaintiff seeks to recover provides: "This policy shall not cover injuries fatal or nonfatal suffered . . . while intoxicated or under the influence of or affected by or resulting from intoxicants or narcotics." The evidence on the trial established that Lester Blank was fatally injured on May 17, 1948, about 4 p. m., while riding in an automobile operated by Milton Karnitz, which ran off the road and into a telephone pole and resulted in Lester Blank sustaining a broken neck which paralyzed his body and caused his death the following day. On May 17th, Blank and Karnitz had appeared in the municipal court at Fond du Lac on a charge of drunken driving on Sunday, May 16, 1948, to which each of them pleaded guilty, and was fined $50 and costs; and they were permitted

to leave the court to go to raise money to pay their fines. At 3 or 3:30 p. m., on May 17th, Blank rode with Karnitz,—who was Albert Immel's hired man and who was doing the driving,—to Immel's farm. Albert Immel and his son, Gordon, were at work in the fields when Blank and Karnitz arrived. Karnitz drove his car to where the Immels were working, and Karnitz got out of the car and asked Albert Immel for the money with which to pay his fine, and he was only interested in getting money to pay his own fine. While Karnitz's car was in the field, Albert and Gordon Immel had an excellent chance to observe the two men who were within a few feet during the entire interview. Blank was sitting in the car with his head in his hands, talking to himself; his pants were wet from a point just below the waistline to the floor, and the Immels then and there from the observation they made formed the opinion that Blank was drunk. Albert Immel walked to his house because he did not want to get into the car with Blank and Karnitz, and he got a check for the amount of Karnitz's fine. Then,—cautioned by Immel's wife that there was no telling what Karnitz would do with the check,—Albert Immel decided to go to Fond du Lac himself and pay the fine. When Albert Immel came out of the house, he found Blank sitting in the car in the same condition as Immel observed him in the field. Albert Immel started then for Fond du Lac in his own car, thinking it safer to drive his own car than to risk riding with Karnitz and Blank, who were occupying a five-passenger car. Because of the condition that Blank was in, Immel did not try to talk to him. Immel drove to Fond du Lac, about seven miles away, and the time consumed in driving was ten or fifteen minutes. Karnitz, with Blank riding with him, followed. Immel reached a point near the courthouse and waited for Karnitz and Blank, and as they were not coming up, Immel started back in search of them and, at a turn in the road, he found Karnitz's car tipped over in the ditch, and that Blank was in an ambulance.

The ambulance took Blank to St. Agnes Hospital and arrived there shortly after 4 o'clock. An interne took charge of the case and had Blank removed to a room in the hospital and then advised Dr. Wier, who was at the hospital, that he had a patient in the emergency room who was badly injured and paralyzed and might be drunk. Dr. Wier responded to the interne's call and upon a thorough examination of Blank, found him to be paralyzed from the neck down with a broken neck, and made an examination of him for intoxication because of the interne's remark and because, as the doctor said, many people are neglected on the assumption that they are intoxicated after an injury; and he was careful to determine the condition as to intoxication of the patient.

Blank's mother came to see him after 6 o'clock and stayed three hours with him, and kissed him on the lips, held his hand, and talked to him. She testified there was no sign of intoxication. While she was there Melvin Scherg, who was Blank's employer, also came to see him in the evening. Scherg testified he spoke to Blank, who talked sensibly and coherently, and asked Scherg to hold his job for him. Scherg testified that Blank was not intoxicated and showed no sign of the use of intoxicants.

Dr. Wier testified:

"The man was lying on his back in bed. His respiration was entirely from his abdomen; his chest was not moving; he was conscious and rational; his eyes were normal; his pupillary reflexes were normal, and he was able to talk and answer questions quite clearly. He was completely paralyzed below his shoulder blades. He was gravely injured. Because of the interne's statement, I was particularly meticulous in my examination, and my conclusion was that his condition was not due to the influence of liquor but the man was gravely injured; that accounted for his symptoms, as I saw them. In my specialty, psychiatry, I have been appointed many times in my twenty-four years of practice here by the county and circuit courts to examine people mentally. In some of these cases the mental condition is caused by liquor.

I am familiar with liquor patients. I would say from my case examination of this patient he was positively not under the influence of liquor at the time I examined him. I noticed no evidence of intoxication. There was a musty odor to his breath, but it was not the odor of acute alcoholism. It was a rather fetid, sweetish odor."

In view of the evidence as to Blank's apparent intoxicated condition while he was at the Immel farm and then en route to the turn in the road at which Karnitz's car tipped over into the ditch, it was within the province of the jury to find that Blank sustained the injury which resulted in his death, while he was intoxicated or under the influence of or affected by or resulting from intoxicants. On the other hand, in view of the testimony of Dr. Wier, Blank's mother, and his employer, the jury could determine that at the time Blank sustained the fatal injury he was not intoxicated or under the influence of or affected by or resulting from intoxicants.

On this appeal, the defendant relies principally upon the grossly improper prejudicial argument to the jury by plaintiff's attorney, and his persistence in making improper, unwarranted, and prejudicial statements to the jury; notwithstanding the objections of defendant's attorney and the court's rulings sustaining defendant's objections.

Typical of such improper and prejudicial argument to the jury by plaintiff's attorney are the following proceedings:

"Mr. O'Brien: . . . and take the verdict out and hang it on the unmarked grave of this boy.

"Mr. McGalloway: I want to register an objection to that.

"Mr. O'Brien: I'm going to yield the floor to Mr. Mc-Galloway, if he wants the floor; and if he wants the $1,000, give it to him, and hang the verdict on an unmarked grave out there, to pay for a coffin and headstone. If John Mc-Galloway needs that so bad give it to him, and answer that question, 'Yes.'

"Mr. McGalloway: I want to object to this as improper argument to the jury on the subject of the setup of a standard

form of health and accident policy of insurance regulated by the laws of this state.

"The Court: The jury is instructed to remember that the terms and provisions of this policy are controlling.

"Mr. O'Brien: They are controlling, and they are in every policy. They're controlling. Did you ever read all of this stuff that's on the inside of your policy? You go on and you pay premiums, months, six months, a year. They take your money."

Such prejudicial remarks were referred to and repeated several times, and in addition thereto, there was also Mr. O'Brien's improper argument which indicated clearly what the effect of the verdict would be if the question submitted to the jury was answered "No;" and there was unreasonable abuse and ridicule heaped upon the defendant's witnesses, without any justification.

In determining the motions after the verdict Judge FEL-LENZ stated:

"It is needless to say that the court is of the opinion that this method of securing a verdict in plaintiff's favor was not accidental. The court is convinced that it was deliberate and intentional and indulged in because counsel for the plaintiff well knew that under the evidence in this case no honest jury would return a verdict in his favor unless their minds were distorted by improper conduct of counsel. For that reason, under the decisions of the court in this state, and without reference to any one specifically, this court is of the opinion that the remarks were so inflammatory and prejudicial that a new trial would have to be ordered."

"Gratuitous statements of counsel, not warranted by the evidence, are universally frowned on and regarded as improper by the courts, for the reason that the statements themselves, or the inferences which naturally flow from them, might tend to mislead or improperly influence the jury. In cases where such misconduct of counsel has had that result, the courts have held it sufficient ground for a reversal of the judgment. Anno. 78 A. L. R. 760, 767. *Jenkins v. N. C. Ore Dressing Co.* 65 N. C. 563; *Rolfe v. Rumford,* 66 Me. 564; *Texas Indemnity Ins. Co. v. McCurry,* 41 S. W. (2d)

215, 78 A. L. R. 760; *Fidelity & Casualty Co. v. Niemann* (8th Cir.), 47 Fed. (2d) 1056; *Hayes v. Smith,* 62 Ohio St. 161, 187, 56 N. E. 879, 7 Am. Neg. Rep. 493. In *Berry v. State,* 10 Ga. 511, 522, the court stated: 'That the practice complained of is highly reprehensible, no one can doubt. It ought in every instance to be *promptly repressed.* For counsel to undertake by a side wind, to get that in as proof which is merely conjecture, and thus to work a prejudice in the mind of the jury, cannot be tolerated.' "

In the case at bar Judge FELLENZ stated:

"Neither as a practicing attorney nor as a trial judge has this court ever heard a more deliberate and intentional abuse of the privileges of an attorney, as an officer of the court, than was participated in by counsel for the plaintiff. That such intentionally vicious attempts were made to mislead the jury, in a measure were probably attributed to the court's failure to strenuously rebuke counsel for his unwarranted and malicious remarks; but the court was dealing with an old practitioner, with many years' experience, whom the court knew was well informed of his rights as an officer of the court, and therefore the court probably was living in the hope that, because of the weakness of the plaintiff's evidence, the jury could not be misled in arriving at a proper verdict."

However, instead of granting a new trial the court concluded:

". . . that the interests of all of the parties involved are best served by not granting a new trial because of the misconduct of counsel, but because of the failure of the plaintiff to present substantial and competent evidence sufficient to create an issue with respect to the intoxication of the deceased at the time he was injured, that it is the duty of the court to change the answer to the question submitted [as to whether Blank sustained the fatal injury while intoxicated or under the influence of or affected by or resulting from intoxication] from 'No' to 'Yes,' and for judgment on the verdict when so amended in favor of the defendant, dismissing the complaint on the merits and with costs."

The judgment entered to that effect cannot be sustained. Although because of the gross and inexcusable misconduct

of plaintiff's attorney, the verdict must be set aside, the parties to the action are entitled to a new trial to determine whether or not Lester Blank was intoxicated or under the influence of or affected by or resulting from intoxication at the time he was fatally injured.

Because of said gross and inexcusable misconduct of plaintiff's attorney, there are applicable on this appeal the provisions in sec. 251.23 (1), Stats., that: "In the supreme court, excepting criminal actions, *costs shall be in the discretion of the court.* In any civil action or proceeding brought to the court by appeal or writ of error, the prevailing party shall recover costs *unless the court shall otherwise order,* and such costs, unless fixed at a lower sum by the court, shall be as follows: . . ." In the exercise of the discretion of this court under said statute no costs shall be recovered by either party on this appeal.

*By the Court.*—Judgment reversed and cause remanded for a new trial.

FAIRCHILD, J., took no part.